**LIMA SURGICAL ASSOCIATES, INC. VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION PLAN TRUST, Huntington National Bank, Trustee, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 72–86T.

United States Claims Court.

June 15, 1990.

David S. Mann, Cincinnati, Ohio, for plaintiff.

Terry T. Coles, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for U.S.

## OPINION

REGINALD W. GIBSON, Judge:

This tax case is before the court on the parties' cross-motions for summary judgment. Jurisdiction is premised on 28 U.S.C. § 1491[1] and 26 U.S.C. § 7422.[2] Plaintiff, Lima Surgical Associates, Inc. Voluntary Employees' Beneficiary Association Plan Trust, Huntington National Bank, Trustee (the Trust), seeks a refund of $13,906.38 in federal income taxes paid for calendar year 1984. This contention is premised on the assertion that the Trust is not subject to taxation under 26 U.S.C. § 501(a) because, as a voluntary employees' beneficiary association (VEBA), it is an exempt organization described in 26 U.S.C. § 501(c)(9).[3]

The United States (defendant), acting through the Internal Revenue Service (IRS), alleges that the Trust is *not* exempt from taxation under § 501(c)(9) because, as *organized* and *operated,* it is not a "voluntary association of employees," inasmuch as it is not controlled by an independent trustee within the meaning of Treas.Reg. § 1.501(c)(9)–2(c)(3)(ii). The defendant further avers that the Trust does not qualify as a tax-exempt VEBA under § 501(c)(9) because it provides benefits that do not constitute "other benefits," similar to those contemplated by Treas.Reg. § 1.501(c)(9)–3(d) or (e). The defendant asserts instead that the Trust actually pays non-qualifying deferred compensation in the form of pension-type benefits that are excluded under Treas.Reg. § 1.501(c)(9)–3(f). Finally, according to the defendant, the Trust's disproportionate benefit payments violate the prohibitions against "private inurement" under Treas.

Reg. § 1.501(c)(9)–4. For the reasons stated hereinafter, the plaintiff's motion for summary judgment is hereby DENIED, and the defendant's cross-motion for summary judgment is concomitantly GRANTED.

*Facts*

Lima Surgical Associates, Inc. (Employer) is an Ohio corporation that was organized in 1969 for the purpose of practicing medical surgery in Lima, Ohio. It employs three physicians, Dr. Thomas Leech, Dr. Norman Browning, and Dr. Leopold Like. These three doctors have been the sole shareholders of the Employer since 1979, during which time they have also served as its only officers and directors. As a consequence of the foregoing arrangement, Drs. Leech, Browning, and Like have ultimate control over all decisions and actions of the Employer. Additionally, at the times relevant to this litigation, the Employer engaged the services of four additional employees, Ms. Christine McGuire, Ms. Gertrude Goodwine, Ms. Rhonda Atkinson, and Ms. Janice Hammell, each of whom primarily performed clerical and/or administrative functions. The amount of employee compensation is determined for all employees by the directors of the Employer, Drs. Leech, Browning, and Like.

All patients are billed by, and make payments to, the Employer. Thus, all revenues of the Employer are generated through the services of the three physician-employees who are engaged pursuant to a written employment agreement which provides in pertinent part as follows:

> Patients treated by the Employee shall be at all times regarded as patients of the Employer and not of the Employee,

---

**1.** 28 U.S.C. § 1491(a)(1) provides in part:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department. . . .

**2.** 26 U.S.C. § 7422(a) provides:

[N]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any

penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

**3.** The text of 26 U.S.C. § 501(a) and § 501(c)(9) are set out in our discussion of the relevant elements in issue under those statutory and regulatory provisions. *See infra.*

and the Employee hereby waives and renounces any interest which he might otherwise acquire in the medical practice of the Employer by virtue of rendering services to patients of such Employer.

\* \* \* \* \* \*

Employee hereby agrees to devote his entire time, skill and energy to the conduct of the medical practice of the Employer.... In rendering efforts as an Employee the Employee shall at all time[s] be subject to [the] full control and instructions of the Employer.

On December 14, 1983, the Employer adopted the Lima Surgical Associates, Inc. Voluntary Employees' Beneficiary Association Plan (the Plan) as well as the Lima Surgical Associates, Inc. Voluntary Employees' Beneficiary Association Plan Trust Agreement (the Trust Agreement). The alleged VEBA, created by these two documents, was instituted subsequent to the termination of the Employer's previous pension plan. The related Trust Agreement was executed between Huntington National Bank of Columbus, Ohio, which was named as the Trustee, and the Employer. The Plan itself was instituted as a *severance pay* plan for all full-time employees. It provides, *inter alia,* severance benefits to any Plan Participant whose employment is terminated for any reason except death, in which case the Participant forfeits all entitlements to severance pay. However, a Participant is not entitled to severance pay if employment is terminated by reason of an unauthorized leave of absence, alcohol or drug abuse, the commission of any criminal act, or a violation of any covenant not to compete with the Employer.

A Plan Participant is defined as an employee who has completed one year of service and has reached the age of 25 as of January 1, 1983, or as of any subsequent June 30 or December 31. The minimum age decreased to 21 years by amendment on December 18, 1985, retroactively effective to January 1, 1985. Upon satisfaction of these minimum service requirements, every full-time employee becomes an automatic Plan Participant by virtue of their employment status. They are not required to pay in order to participate in the Plan, inasmuch as all contributions to the Trust under the Plan are made by the Employer. The Plan Administrator is the Employer, which is also a "named fiduciary" under the Plan. Thus, any instructions regarding the administration of the VEBA Plan "always stem from the [Employer]."

Severance benefits under the Plan payable up to a maximum of 104 weeks are based on the weeks of service rendered by the Participant and his weekly pay during the most recently completed Plan (calendar) year. Benefits are provided according to the following Plan schedule:

I. For Less than 260 Weeks of Service:

| Weeks of Service | Benefit |
| --- | --- |
| 0–103 | 2 weeks pay |
| 104–259 | 3 weeks pay |

II. For 260 Weeks of Service or More:
A weekly benefit payable for the number of weeks provided in Column (C) below. Each such weekly payment shall equal the product of the Participant's Weekly Pay, the Participant's Weeks of Service and the appropriate percentage from Column (B) below:

| (A) Weeks of Service | (B) Percentage of Weekly Pay For Each Week of Service | (C) Weeks Payable |
| --- | --- | --- |
| 260–311 | .050 | 30 |
| 312–363 | .050 | 30 |
| 364–415 | .050 | 30 |
| 416–467 | .050 | 30 |
| 468–519 | .050 | 30 |
| 520–571 | .060 | 40 |
| 572–623 | .060 | 40 |
| 624–675 | .060 | 40 |
| 676–727 | .060 | 40 |
| 728–779 | .060 | 40 |
| 780–831 | .070 | 60 |
| 832–883 | .080 | 80 |
| 884–935 | .090 | 100 |
| 936 or more up to a maximum of 1,000. | .100 | 104 |

Thus, according to a stipulated example, a Plan Participant who terminates employment after 828 weeks of service is entitled to a weekly benefit of 57.96% of his weekly pay, which is defined as compensation during the most recently completed plan year divided by 52. This is true because under Column (B) in the preceding schedule, the Participants' weekly benefit is .070 percent of weekly pay for *each* week of service. The Participant has 828 weeks of service, so the total weekly benefit is 828 × .070 or 57.96% of the Participants' weekly pay. Under Column (C), that benefit is payable for 60 weeks.

From the inception of the Plan, all of the full-time employees of the Employer have been Participants. By the end of 1984, the year for which the refund is sought, the annual compensation and total weeks of service for each Participant were as follows:

| Participant | Compensation | Weeks of Service |
| --- | --- | --- |
| T. Leech | $139,551 | 828 |
| N. Browning | $492,760 | 828 |
| L. Like | $536,908 | 828 |
| C. McGuire | $ 21,166 | 828 |
| G. Goodwine | $ 21,511 | 828 |
| R. Atkinson | $ 21,307 | 616 |
| J. Hammell | $ 21,307 | 498. |

Thus, at the end of 1984, each Plan Participant would have been entitled to receive the following weekly benefit:

| Participant | Amount |
| --- | --- |
| Dr. Like | $5,998.58/week |
| Dr. Browning | $5,496.17/week |
| Dr. Leech | $1,556.72/week |
| C. McGuire | $ 236.06/week |
| G. Goodwine | $ 240.12/week |
| R. Atkinson | $ 151.61/week |
| J. Hammell | $ 102.44/week. |

The Plan was designed and instituted with the assistance and advice of one Jack Scott, an independent actuary and financial planner in Columbus, Ohio. Mr. Scott has made annual recommendations as to the appropriate and necessary Employer contribution levels to adequately fund the Trust. These recommendations, which allegedly have not exceeded the amount deemed necessary to provide scheduled benefits under the Plan according to actuarial determinations by Mr. Scott, have always been followed by the Employer. In 1984, the Employer made a contribution of $337,450.30 to the Trust Fund.

All Employer contributions to the Trust under the Plan have been held by the Trustee, Huntington National Bank of Columbus, Ohio. The Employer has directed the Trustee to invest the funds in a manner that is not speculative. In that connection, according to a responsible official of the Trustee, the Employer's investment instructions have been general in nature. In compliance with these instructions, the Trustee has invested the Trust assets in money market funds and guaranteed investment contract mutual funds, both of which are viewed as readily liquid, low-risk investments.

During the tax year in issue, no physician employee, the three of whom are the sole shareholders of the Employer, terminated their employment or received any benefits under the Plan.[4] In fact, during that time, only one employee, Ms. Gertrude Goodwine, terminated employment.[5] Ms. Goodwine, a Participant in the Plan, retired on December 31, 1984, at which time the Employer executed and issued a "Payment Authorization Notice" to the Trustee "as a result of her ... retirement." DX 4. The Notice was signed by Dr. Leech in his capacity as president of the Employer and delineates *the* reason for benefit payment authorization—"Employee retired." DX 4. Further, it contains a reference to the fact

---

4. At oral argument, counsel for the plaintiff stated that Dr. Leech terminated his employment in *1989* due to a heart attack. He allegedly received benefits according to the terms of the Plan. However, no probative evidence was offered to establish and solidify the circumstances surrounding the termination of Dr. Leech or the amount and duration of any such benefits.

5. Another non-shareholder employee, Ms. Christine McGuire, also terminated her employment at some unspecified date after 1984. While the Trust acknowledges that she received a benefit payment pursuant to the Plan, the record contains no evidence on the nature of her termination or the amount and duration of any such benefits.

that the retiree was "100% vested" in the Plan at that time. DX 4. Consequently, it directed the payment of a $20,000 lump sum cash amount to Ms. Goodwine in two installments, $10,000 each, due on January 1, 1985 and on January 1, 1986. DX 4.

After the Notice was issued, Ms. Goodwine received such retirement benefits that were paid from the "VEBA" Plan account. The Trustee, on March 6, 1985, issued a $9,500 check drawn on the Trust account in partial payment under the Plan. DX 100 and DX 101. Also, upon disbursement, the bank, as Trustee, filed a Form W–2P 1985 with the IRS entitled "Statement for Recipients of Annuities, Pensions, Retired Pay, or IRA Payments." DX 102.

Previously, the Trust filed a timely application on or about August 14, 1984, for tax-exempt status under 26 U.S.C. § 501(a) as a voluntary employees' benefit association, as described in 26 U.S.C. § 501(c)(9). In response thereto, the IRS denied that application on February 28, 1985, after concluding that the Trust violated the proscriptions against private inurement as described in Treas.Reg. § 1.501(c)(9)–4(a). The Trust administratively appealed, after which the IRS, relying on the reasons advanced in its previous determination, rendered a final adverse decision on April 30, 1985.[6]

Thereafter, the Trust filed a Form 1041 income tax return with the IRS in June 1985 for calendar year 1984, pursuant to which it paid $13,906.38 in income taxes.

The Trust then submitted on or about July 19, 1985, an amended Form 1041 for the taxable year 1984 by which it claimed a refund for those taxes paid on the basis that it was exempt from taxation under 26 U.S.C. § 501(c)(9). When the IRS failed to act within six months, as a consequence, the Trust timely commenced this law suit on February 4, 1986. The claim upon which this action is based was later denied by the IRS for the same reasons stated in its adverse ruling of April 30, 1985.

*Contentions*

Both motions for summary judgment are squarely premised on the issue—whether the Trust duly satisfies the statutory criteria for a tax-exempt organization identified under 26 U.S.C. § 501. The Trust, of course, avers that it is a qualified VEBA "described" under 26 U.S.C. § 501(c)(9), and, as a consequence, is exempt from taxation pursuant to 26 U.S.C. § 501(a).[7] Therefore, according to the Trust, it is in complete compliance with all statutory requirements, as are more fully described in applicable Treasury Regulations, *see infra.*

The defendant, on the other hand, asserts that the Trust is not exempt under 26 U.S.C. § 501(a) because it does *not* qualify as a VEBA under 26 U.S.C. § 501(c)(9). In the defendant's view, the Trust also does not qualify as a tax-exempt VEBA because it violates *three* (3) critical statutory requirements as described further in applicable Treasury Regulations. First, the defendant contends that the Trust is orga-

---

**6.** The April 30, 1985 IRS ruling stated, in pertinent part, as follows:

Our adverse ruling of February 28, 1985, was based on the fact that Thomas Leech, Leopold Like, and Norman Browning, who are the owners of the employer corporation, are entitled to a dominant share of the benefits under the plan. Also, by reason of their control over the employer corporation, Dr. Leech, Dr. Like, and Dr. Browning have ultimate control over the continued existence of the trust. Under the circumstances, we concluded that Dr. Leech, Dr. Like, and Dr. Browning maintain a posture that is incompatible with the inurement proscription of section 1.501(c)(9)–4(a) of the Income Tax Regulations.

**7.** Together these subsections of § 501 provide that:

*(a) Exemption from taxation.*—An organization described in subsection (c) ... shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

\* \* \* \* \* \*

*(c) List of exempt organizations.*—The following organizations are referred to in subsection (a):

\* \* \* \* \* \*

(9) Voluntary employees' beneficiary associations [VEBA] providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual.

nized in such a way that it violates the inurement proscriptions of Treas.Reg. § 1.501(c)(9)–4. Second, it is alleged that the Trust does not operate as a VEBA, in that it provides for the payment of non-qualifying pension-type benefits described in Treas.Reg. § 1.501(c)(9)–3(f). And thirdly, the Trust has purportedly failed to prove that it is controlled by an independent trustee, as it must under Treas.Reg. § 1.501(c)(9)–2(c)(3).

*Standard of Review*

The subject cross-motions are before the court pursuant to RUSCC 56(c), under which summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In such circumstance, judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may be discharged by showing that there is a lack of evidence to support the non-movant, *id.* at 325, 106 S.Ct. at 2554, while the opposing party must set forth specific facts to show that there are genuine issues for trial. RUSCC 56(f). There are no genuine issues for trial unless there is sufficient evidence on which the fact finder could return a verdict in favor of the non-movant, *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987), the determination of which "necessarily implicates the substantive evidentiary standard of proof that would apply at a trial on the merits." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

*Discussion*

 It is pursuant to these oft-cited principles that we now address the ultimate issue raised by the subject cross-motions—whether or not the Trust qualifies as a tax-exempt VEBA pursuant to 26 U.S.C. § 501(c)(9). At first blush, the cryptic statutory provisions of 26 U.S.C. § 501(c)(9) appear deceptively simple. However, as is often true in tax matters, upon further reflection and amplification by applicable regulations, such is surprisingly found not to be the case.[8] Thus, it is imperative that we focus closely on the more detailed explication of the operative requirements for obtaining tax exemption under 26 U.S.C. § 501(c)(9) as contained in Treas.Reg. § 1.501(c)(9)–1. That regulation provides as follows:

> Voluntary employees' beneficiary associations, in general.—To be described in section 501(c)(9) *an organization must meet all of the following requirements:*
>
> (a) The organization is an employees' association,
>
> (b) Membership in the association is voluntary,
>
> (c) The organization provides for the payment of life, sick, accident, or other benefits to its members or their dependents or designated beneficiaries, and substantially all of its operations are in furtherance of providing such benefits, and

---

**8.** We observe that the applicable regulations at issue in this case were promulgated by the Treasury Department pursuant to its general rulemaking powers under 26 U.S.C. § 7805(a), and thus they are entitled to less deference than a regulation issued under a specific congressional grant of authority *to define a statutory term or prescribe a method of statutory execution. See generally, Anesthesia Service Medical Group, Inc. v. Commissioner of Internal Revenue,* 85 T.C. 1031, 1048 (1985) (citations omitted). However, we must defer, nevertheless, to regulations that "implement the congressional mandate in some reasonable manner." *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967), *quoted in Anesthesia,* 85 T.C. at 1048. In other words, we must apply pertinent administrative regulations "unless [they are] unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948), *quoted in Anesthesia,* 85 T.C. at 1048. Thus, when considering the operative regulations here, the critical inquiry is—whether they are consistent with the plain language, origin, and purpose of 26 U.S.C. § 501(c)(9). *Anesthesia,* 85 T.C. at 1048–1049 (citation omitted). While the plaintiff does not raise the issue, we believe that the pertinent regulations here are indeed consistent with the plain language, origin, and purpose of that statute. *See generally Anesthesia,* 85 T.C. at 1049–1051 (discussing the applicability of regulatory provisions defining "other benefits").

(d) No part of the net earnings of the organization inures, other than by payment of the benefits referred to in paragraph (c) of this section, to the benefit of any private shareholder or individual.

(emphasis added).

The Trust argues that it has satisfied each of the foregoing elements. The defendant, on the other hand, contends that the entity under consideration here—is not organized as a "voluntary association of employees" under Treas.Reg. § 1.501(c)(9)–2(c)(3); is neither organized nor operated to provide the type of qualifying "other benefits" contemplated in Treas. Reg. § 1.501(c)(9)–3(d) or (e); and that it is also impermissibly organized in such a way that violates the prohibitions against "private inurement" under Treas.Reg. § 1.501(c)(9)–4. By these pointed assertions, the defendant avers that the Trust fails three of the four obligatory elements enumerated in Treas.Reg. § 1.501(c)(9)–1. More specifically, in the defendant's view, the Trust cannot satisfy the VEBA characteristics described in subparagraphs (a), (c), and (d) above. Each of these indispensable elements is explicitly covered in greater detail by interpretive regulations, and we hereinafter discuss them seriatim.

Before doing so, however, we are compelled to observe that, as a matter of law, an exemption from taxation, such as the exemption sought by the Trust here, is an exception to the norm of taxation as contemplated by the general rule stated in 26 U.S.C. § 61: "[G]ross income means all income from whatever source derived." Accordingly, "an organization which seeks to obtain tax exempt status ... bears a heavy burden to prove that it satisfies all the requirements of the exemption statute ... exemptions from taxation [will not be] granted by implication." *Harding Hospital, Inc. v. United States*, 505 F.2d 1068, 1071 (6th Cir.1974) (citation omitted); *accord Founding Church of Scientology v. United States*, 188 Ct.Cl. 490, 412 F.2d 1197 (1969); *Puritan Lawn Memorial Park Cemetery v. United States*, 15 Cl.Ct. 234 (1989). More importantly, exemption provisions such as 26 U.S.C. § 501(c)(9) are matters of legislative grace and not of right, *see generally Puritan Lawn*, 15 Cl.Ct. at 240 (citation omitted), and consequently, "a statute creating an exemption *must be strictly construed* and any doubt must be resolved in favor of the taxing power." *Harding*, 505 F.2d at 1071 (citations omitted) (emphasis added).

■ In addition to proving that it has satisfied every component of the exemption statute, the plaintiff is concomitantly charged with the burden of rebutting the determination of the Commissioner. Here, the IRS concluded that the Plan Trust was not a VEBA because it was flawed in its organization in that it violated the prohibition against private inurement. The well-established principle in federal tax law is that determinations of the Commissioner are presumptively correct. *See, e.g., Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Morowitz v. United States*, 15 Cl.Ct. 621, 629 (1988). To overcome this presumption, the plaintiff must, of course, produce *"substantial evidence* as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States*, 206 Ct.Cl. 143, 151–152, 510 F.2d 1365, 1369 (1975) (emphasis added).

In the case at bar then, the plaintiff must demonstrate that it satisfies *all* obligatory statutory criteria for exemption, as set out in the statute and described in applicable Treasury Regulations. It must further prove, by "substantial evidence," that the IRS incorrectly concluded that the Trust violates the prohibitions against private inurement. Recognizing these heavy burdens, we now address the aforementioned statutory requirements, as explicated by pertinent Treasury Regulations, and the specific questions raised with respect to each. For all of the reasons stated below, we hold that the plaintiff has failed to satisfy three of the four conjunctive requirements of the statute, as amplified in Treas.Reg. § 1.501(c)(9)–1. Moreover, the Trust has failed to demonstrate that the determination of the Commissioner was erroneous by substantial evidence.

## A. *Voluntary Association of Employees*

The threshold question raised by the subject application for tax exemption under 26 U.S.C. § 501(c)(9), and by Treas.Reg. § 1.501(c)(9)–1(a), is—whether the Trust is a voluntary association of employees. The requirement for qualification as a voluntary association is more thoroughly explained in Treas.Reg. § 1.501(c)(9)–2. While that regulation defines membership, *see* Treas.Reg. § 1.501(c)(9)–2(a), and the meaning of the term "employee," *see* Treas.Reg. § 1.501(c)(9)–2(b), the parties here contest—whether the Trust fits within the description of a voluntary association of employees, as set out in Treas.Reg. § 1.501(c)(9)–2(c).

More specifically, the defendant alleges that the Trust has not satisfied Treas.Reg. § 1.501(c)(9)–2(c)(3). In pertinent part, that subsection provides as follows:

(c) *Description of voluntary association of employees—* (1) Association. To be described in Section 501(c)(9) and this section there must be an entity, such as a ... trust ... having an existence independent of the member-employees or their employer.

\* \* \* \* \* \*

(3) *Of employees. To be described in [26 U.S.C. § 501(c)(9) and] this section, an organization must be controlled —*

\* \* \* \* \* \*

(ii) *By independent trustee(s) (such as a bank),* or

(iii) By trustees or other fiduciaries at least some of whom are designated by, or on behalf of, the membership. Whether control by or on behalf of the membership exists is a question to be determined with regard to all of the facts and circumstances, but generally such control will be deemed to be present when the membership (either directly or through its representative) elects, appoints or otherwise designates a person or persons to serve as chief operating officer(s), administrator(s), or trustee(s) of the organization.

*For purposes of this paragraph an organization will be considered to be controlled by independent trustees if it is an "employee welfare benefit plan", as defined in section 3(1) of the Employee Retirement Income Security Act of 1974 (ERISA), and, as such, is subject to the requirements of Parts 1 and 4 of Subtitle B, Title I of ERISA ....*

(emphasis added).

The Trust contends that it satisfies this subsection for two reasons. First, it is purportedly controlled by the Huntington National Bank, which, according to the Trust, is an *independent* trustee by definition under the plain language of Treas.Reg. § 1.501(c)(9)–2(c)(3)(ii). Secondly, the plaintiff avers that the Plan is a severance pay plan, which, as an alleged employee welfare benefit plan under section 3(1) of ERISA, 29 U.S.C. § 1002(1), puts it within the independent trustee qualifications of Treas.Reg. § 1.501(c)(9)–2(c)(3)(iii).

In turn, the defendant concomitantly argues that there is no probative evidence to support a finding that the Trust is controlled by an independent trustee. To the contrary, it contends that it is patently clear, as a matter of law, that the *indisputable* facts establish that the Employer controls the Trust, not an independent trustee. The defendant further asserts that the assumed independent control purportedly arising under section 3(1) of ERISA, 29 U.S.C. § 1002(1), as referenced in Treas. Reg. § 1.501(c)(9)–2(c)(3)(iii), is merely a *rebuttable* presumption. Under this theory, independent control will be assumed *only* when the "organization ... is an employee welfare benefit plan...." This rebuttable presumption provides no refuge for the Trust, in the defendant's view, because the Plan at issue is, in reality, an employee *pension* benefit plan under section 3(2) of ERISA, 29 U.S.C. § 1002(2), *not* an employee welfare benefit plan under section 3(1) of ERISA, 29 U.S.C. § 1002(1). Thus, control by an independent trustee is wanting and will not be presumed.

We agree with the defendant on both grounds, and hold that the Trust is not

controlled by an independent trustee under Treas.Reg. § 1.501(c)(9)–2(c)(3). This conclusion is premised upon an examination of several *indisputable* relevant provisions in the Trust Agreement between the Employer and the Trustee. Actually, the Trust Agreement, *ipso facto*, reveals that the control of the Trustee over the Trust is so limited that it is in reality illusory. Indeed, the self-evident indisputable facts and circumstances here establish that the real locus of control resides in the Employer, which is, in turn, controlled by the three physician employee/shareholders, Drs. Leech, Browning, and Like.

The compelling uncontroverted facts requiring this conclusion are contained in the plain and literal language of the Trust Agreement itself. That agreement purports to grant various and sundry powers to the Trustee, as enumerated in Trust Agreement Article 4.1. However, these so-called "independent" powers are completely vitiated by other superseding provisions which vest ultimate control in the Employer to the exclusion of the Trustee. This settled fact is most clearly demonstrated by Trust Agreement Article 4.3, which states that:

> *Notwithstanding anything to the contrary in this Article or any other section of this Trust Agreement, the Plan Administrator* [the Employer] *shall at all time[s] have the power,* but shall not be obligated, *to direct the Trustee in the exercise of any of the powers granted in Section [sic] 4.1 above . . . .* [T]he Plan Administrator [the Employer] may appoint an investment manager or investment managers . . . to manage (including the power to acquire and dispose of) any assets held in the Trust Fund. . . . *[T]he Plan Administrator [the Employer] may issue such direction to the Trustee as it deems advisable.* In the absence of any such directions the Trustee shall be free to exercise its powers hereunder in its own discretion.

(emphasis added). We read the operative word in the quoted language to be "direct," which, as defined by *Webster's New Collegiate Dictionary,* 322–323 (5th ed. 1977), means—"to regulate the activities," "to dominate and determine the course," "to . . . enjoin with authority," or "to . . . determine . . . procedure."

Against this background, given said word its literal meaning, it is indisputable that the *Employer* has paramount authority and control over the Trust Fund. In this context, we note that the Employer has the ultimate right to direct or dominate the Trustee in the exercise of every significant investment power delineated under Article 4.1. The omnipotent control granted to the Employer by virtue of Article 4.3 includes, but is not limited to, the power to dictate the disposition of all or any part of the trust fund, Article 4.1(a); the investment and reinvestment of the trust fund, Article 4.1(b); to pledge the trust funds as collateral, Article 4.1(c); of arbitration, compromise, or adjustment of claims in favor of or against the trust fund, Article 4.1(e); of executing instruments, such as deeds, leases, mortgages, contracts, agreements, assignments, transfers, and bills of sale, Article 4.1(f); of retention of uninvested cash in the trust fund to meet contemplated transfers or payments, without liability for interest to the Trustee, Article 4.1(g); and the employment of agents, Article 4.1(i). As already noted by reference to the powers enumerated in Article 4.3, the Employer "may issue such direction to the Trustee *as it deems advisable [in the exercise of those duties contained in Article 4.1]*" (emphasis added).

The employer also controls disbursements from the trust fund. That is to say, the Trustee can make no payments from the trust fund in the absence of written instructions from the Employer, Article 5.1. That article also purports to obligate the Employer to follow Plan provisions and, further, requires the Employer to refrain from directing payments that might be used for purposes other than for the exclusive benefit of Participants. While this supposed safeguard might prevent the improper use of Trust Funds, it does *not* diminish the unfettered control of the Employer in directing distributions from the fund vis-a-vis that retained by the Trustee.

In other words, notwithstanding the obligations imposed in Article 5.1, the Employer is still in ultimate control with respect to regulating disbursements. Thus, it is clear that the Trustee can make payments from the fund only when they are *authorized* by the Employer, only in the manner *directed* by the Employer, only to those persons *designated* by the Employer, and only in those amounts *specified* by the Employer. Additionally, the Trustee is subject to such direction as the Plan Administrator deems advisable. While the exercise of this control is not unlimited, it is nevertheless more than sufficient to demonstrate that the organization here (the Trust) is not controlled by an independent trustee for the purposes of Treas.Reg. § 1.501(c)(9)–2(c)(3)(ii).

As if the investment and disbursement powers retained by the Employer were not enough to effectively deprive the Trustee of any true independence over the Trust, other relevant Trust provisions further bolster the conclusion that unbridled power over the Trust remains in the Employer. For example, the Employer is *required* to indemnify the Trustee against any liability arising under the Plan for action taken under direction from the Employer, Article 7.3. It may also engage the Trustee as *its* agent in the performance of any duties under the Plan, without any concomitant increase in the amount of liability flowing to the Trustee, Article 7.4. Of critical significance is the fact that the Employer retains the power to *amend* or *terminate* the Trust Agreement *at any time*, Article 9.1. Finally, at any time upon 60 days' written notice, the Employer also has the unfettered right to discharge the Trustee, Article 10.1, and appoint a successor of its choosing, Article 10.3.

These significant provisions demonstrate, beyond any measure of doubt, that *the* Employer, not the Trustee, controls the Trust as envisioned by Treas.Reg. § 1.501(c)(9)–2(c)(3), and we so find. The indisputable facts compel us to hold that the Trustee is not "independent" in any literal sense of the word. In fact, as the defendant correctly asserts, the Trustee is little more than a hospitable custodian of the trust fund for the Employer. Conse-

quently, we hold that the Trust has failed to satisfy the first statutory requirement for exemption as a 26 U.S.C. § 501(c)(9) VEBA, as described in Treas.Reg. § 1.501(c)(9)–1(a) and § 1.501(c)(9)–2(c)(3).

We now turn our attention to *Wade L. Moser, et al.,* T.C.M. ¶ 89,142 (P–H 1989), which is heavily relied on by the plaintiff. The Trust urges us to find that this memorandum decision by the Tax Court is dispositive on the control issues raised in this case, *supra.* More specifically, it contends that the level of control retained by the Employer in the case at bar is no more engulfing than the level of control exercised by the employer in *Moser.* In that case, the Tax Court condoned a seemingly pervasive amount of control on the basis that the employer's powers were not unlimited, and therefore concluded that the VEBA assets were controlled by an independent trustee.

The relevant issue in *Moser* was whether the plaintiff was entitled to a $200,000 deduction for a contribution made to its VEBA under 26 U.S.C. § 162. As part of its analysis on this control issue, the Tax Court considered whether the employer's control over the amendment or termination provisions of the trust was such that the employer, in effect, never relinquished control over the trust funds, and thus never paid or incurred any expenses that could be properly deducted under 26 U.S.C. § 162. The Tax Court found that the control exercised by the employer with respect to trust asset management, although significant, was not determinative because the employer did not have total unfettered control of those assets. *Moser,* T.C.M. ¶ 89,142 at 662–89. In this context, the Tax Court also observed that the trustee in *Moser,* a North Dakota bank, held title to all trust assets, retained possession of the assets, and actually exerted day-to-day control over those assets. *Moser,* T.C.M. ¶ 89,142 at 662–89.

■ Our initial observation is that the Claims Court is not obliged to follow the Tax Court. Secondly, we think *Moser* is only tangentially relevant to the control issues raised in this case under Treas.Reg.

§ 1.501(c)(9)–2(c)(3). And finally, we decline to follow that decision, in any event, for three reasons. First and foremost, *Moser* underscores the fact that the parties conceded that "the question of whether the VEBA meets the requirements for exemption under section 501(c)(9) is *not* an issue in the instant case." *Moser*, T.C.M. ¶ 89,142 at 661–89 (emphasis added). In contrast, we observe that whether the Trust satisfies the necessary elements for VEBA status *is the* paramount issue in the case at bar. Secondly, it is clear that the type of control at issue in *Moser* was whether, by virtue of the control exerted by the employer through its right to amend or terminate, the trust assets could revert or inure to the employer upon the discontinuation of the trust. This question was relevant for the purposes of determining whether the benefits conferred by the plan were in any way illusory.

That situation is quite different from the situation presented by Treas.Reg. § 1.501(c)(9)–2(c)(3)(ii), which we think is a much broader prohibition against employer control. The control implicated by the regulation before us is, in our view, designed to discourage *any excessive* amount of employer control over the Trustee, not just the type of employer control that would result in a reversion of trust assets upon termination. Treas.Reg. § 1.501(c)(9)–2(c)(3) looks to an entity that is independent in the truest sense of the word. Viewed in its entirety, the regulation makes no provision for the level of control retained by the Employer under the Trust Agreement in the case at bar.

Third, and finally, the Tax Court reached its determination, in part, because the trustee in *Moser* exerted day-to-day control over the assets.[9] Thus, the Tax Court was unable to conclude that the employer had total unfettered control over those assets. On the record before us here, there is no evidence to suggest that in truth the same

occurred in the case at bar. Thus, for the foregoing reasons, we find that *Moser* gives no comfort to the assertion that the Trust is controlled by an independent Trustee. To the contrary, we hold that the Trust is controlled by the Employer in all material respects, and thus, it is not a "voluntary association of employees" under Treas.Reg. § 1.501(c)(9)–2(c)(3).

### B. *Other Benefits*

The next criterion in issue in our analysis of whether the organization is a VEBA within the contemplation of § 501(c)(9) is— whether the Plan is *organized* and operated to provide for the payment of life, sick, accident, or other benefits as envisioned under 26 U.S.C. § 501(c)(9) and Treas.Reg. § 1.501(c)(9)–1(c). The general rule with respect to the type of benefits that are qualified and will receive tax-exempt status as a valid VEBA plan is set out in Treas. Reg. § 1.501(c)(9)–3(a), which provides in relevant part as follows:

> *In General.* The *life, sick, accident, or other benefits* provided by a voluntary employees' beneficiary association must be payable to its members, their dependents, or their designated beneficiaries. *A voluntary employee's beneficiary association is not operated for the purpose of providing life, sick, accident, or other benefits unless substantially all of its operations are in furtherance of the provision of such benefits.* Further, an organization is not described in this section if it systematically and knowingly provides benefits (of more than a *de minimis* amount) that are not permitted by paragraph (b), (c), (d), or (e) of this section.

(emphasis added).

Here the Trust implicitly concedes that the Plan is not designed for the payment of

---

**9.** In *Moser*, the tax-exempt status of the employer's VEBA had been revoked. Thus, the Tax Court, in considering whether the level of control held by the employer would permit a reversion of assets, also looked at the fact that no trust fund assets were transferred to the employer upon revocation of that status. Furthermore, there was no evidence that the VEBA plan there had been operated in such a way so as to indicate that any assets had inured to the benefit of the employer. These are distinguishing facts regarding the case in issue.

any type of life,[10] sick, or accident [11] benefits, and, thus, there is no issue in this case as to the provision of such benefits. Instead, the Trust argues that the Plan provides severance pay, which purportedly qualifies as "other benefits" under Treas. Reg. § 1.501(c)(9)–3(e), *see infra.* The defendant, on the other hand, avers that the Plan pays benefits that are not qualified severance benefits within that regulation. To the contrary, it contends that the majority of the benefits under the Plan are a form of deferred compensation that is more akin to the non-qualifying pension benefits described in Treas.Reg. § 1.501(c)(9)–3(f), *see infra.* We agree with the arguments asserted by the defendant, and find, for the reasons stated below, that the Plan in issue here, by paying retirement benefits as part and parcel of its alleged severance pay plan, is *both* organized and operated to provide non-qualifying benefits.

The provisions relevant to the question of whether the severance benefit payments here at bar are "other benefits" are found in Treas.Reg. § 1.501(c)(9)–3(d), (e), and (f), which state:

> (d) Other benefits. *The term "other benefits" includes only benefits that are similar to life, sick, or accident benefits. A benefit is similar to a life, sick, or accident benefit if—*
>
> > (1) It is intended to safeguard or improve the health of a member or a member's dependents, or
> >
> > (2) *It protects against a contingency that interrupts or impairs a member's earning power.*
>
> (e) Examples of "other benefits." ... [S]everance benefits (under a severance pay plan within the meaning of 29 C.F.R. § 2510.3–2(b)) ... are considered "other benefits" because they protect against a contingency that interrupts earning power....

> (f) Examples of nonqualifying benefits. *Benefits that are not described in paragraphs (d) or (e) of this section are not "other benefits".... The term "other benefits" does not include any benefit that is similar to a pension or annuity payable at the time of mandatory or voluntary retirement,* or a benefit that is similar to the benefit provided under a stock bonus or profit-sharing plan. For purposes of section 501(c)(9) and these regulations, *a benefit will be considered similar to that provided under a pension, annuity,* stock bonus or profit-sharing plan *if it provides for deferred compensation that becomes payable by reason of the passage of time, rather than as the result of an unanticipated event ....*

(emphasis added).

Pursuant to the foregoing provisions, and the general rule stated in Treas.Reg. § 1.501(c)(9)–3(a), we must determine— whether, on the undisputed facts here, "substantially all" of the operations of the Trust are in furtherance of providing "other benefits" as described in paragraphs (d) or (e). The Trust strenuously contends that its severance benefits, which allegedly are within the meaning of 29 C.F.R. § 2510.3–2(b), qualify as "other benefits" under Treas.Reg. § 1.501(c)(9)–3(e). The defendant vigorously disputes this assertion, claiming that the Trust cannot qualify under either Treas.Reg. § 1.501(c)(9)–3(d) or (e). It argues that, in truth, the Plan *has paid* and will pay non-qualifying deferred compensation that is "similar to a pension or annuity payable at the time of voluntary or mandatory retirement" as explicated under Treas.Reg. § 1.501(c)(9)–3(f).

Again, we agree with the defendant, and hold that the retirement benefit payments made are the type of non-qualifying benefits described in Treas.Reg. § 1.501(c)(9)–3(f). Additionally, we hold,

**10.** The term "life benefit" means a benefit (including a burial or wreath benefit) payable by reason of the death of a member or dependent. It "does not include a pension, annuity, or similar benefit." Treas.Reg. § 1.501(c)(9)–3(b).

**11.** The term "sick and accident benefits" means amounts furnished in the event of illness or personal injury, or amounts paid in lieu of income when unable to work due to sickness or injury, and amounts designed to safeguard or improve health of members and dependents. Treas.Reg. § 1.501(c)(9)–3(c).

for the reasons expressed, *infra,* that the retirement benefits payable under the Plan are not within the definition of severance benefits defined in 29 C.F.R. § 2510.3–2(b). Thus, those retirement benefits do not qualify as "other benefits" under Treas. Reg. § 1.501(c)(9)–3(e). Nor are the retirement benefits payable under the Plan similar to life, sick, or accident benefits that protect against a contingency that interrupts or impairs a member's earning power sufficient to qualify as "other benefits" under Treas.Reg. § 1.501(c)(9)–3(d).

1. *The Plan Does Not Provide "Other Benefits" Under Treas.Reg. § 1.501(c)(9)–3(e).*

As previously noted, *supra,* subparagraph (e) of § 1.501(c)(9)–3 provides "[e]xamples of other benefits" that may constitute qualifying benefits. An example of such benefits are those "severance benefits" paid under a plan within the meaning of 29 C.F.R. § 2510.3–2(b). Given the foregoing, the critical issue under this section is—whether the severance benefits payable under the Plan constitute "severance benefits" within the contemplation of 29 C.F.R. § 2510.3–2(b). If such payments in law qualify under § 2510.3–2(b), then, of course, they are qualified "other benefits" under § 1.501(c)(9)–3(d) and (e). 29 C.F.R. § 2510.3–2(b) provides, in part, as follows:

(b) *Severance pay plans.* (1) For purposes of Title I of the Act [ERISA] and this chapter, an arrangement [Plan] shall not be deemed to constitute an employee pension benefit plan or pension plan solely by reason of the payment of severance benefits on account of the termination of an employee's service, *provided that:*

(i) *Such payments are not contingent, directly or indirectly, upon the employee's retiring;* .

(ii) The total amount of such payments [do] not exceed the equivalent of twice the employee's annual compensation during the year immediately preceding the termination of his service; and

(iii) All such payments to any employee are completed [ (B) ... within 24 months after the termination of the employee's service].

(emphasis added).

We observe, at the outset, that these elements are in the conjunctive and the plaintiff must, therefore, meet all three to duly qualify its severance payments as "other benefits." According to the Trust, it satisfies all such elements and thus the severance benefit definition because, while it pays *retirement* benefits, retirement is only one of several possible events that will trigger the payment of benefits under the Plan. Thus, it alleges that it satisfies 29 C.F.R. § 2510.3–2(b)(i), the critical element under this regulation for the purposes of this case, because some of its payments other than severance benefits are not *contingent* solely upon a participant's retirement. In short, this is simply a gratuitous interpretation of 29 C.F.R. § 2510.3–2(b)(i) and, as a consequence, flies squarely in the face of its plain language. This bootstrap argument advanced by the Trust is, therefore, misplaced and patently untenable.

This is so because we read 29 C.F.R. § 2510.3–2(b) to explicitly exclude therefrom the payment of *any* severance benefits premised "upon the employee retiring" such as those admittedly intended and in fact paid as part of the Plan at bar. 29 C.F.R. § 2510.3–2(b) embraces a definition of qualifying severance benefits that is broad and wide-ranging, provided those benefits satisfy all the regulatory criteria. However, under no reasonable interpretation can it be construed to include any payment that is premised in any way on retirement—"directly or indirectly." In other words, *any* payment that is necessitated *by the employee's* retirement, be it *voluntary* or *mandatory,* does not qualify for treatment as a severance benefit under that regulation. Taking this analysis one step further, 29 C.F.R. § 2510.3–2(b)(i) notes that in those instances where a payment was made *because of retirement,* the plan under which that payment was made may be viewed as an "employee pension benefit plan or pension plan." In view of the undisputed facts before us, we are compelled to find that the Plan pays retirement benefits clearly outside the purview of a

true severance benefit Plan as envisioned in 29 C.F.R. § 2510.3–2(b).

The Trust admits that the Plan is designed to provide benefits upon the retirement of any Participant as one of several possible types of termination under § 1.16 of the Plan. The ability to pay retirement benefits is clearly one of the reasons for adoption of the Plan. Moreover, like the defendant, we do not think it is a coincidence that the Plan was adopted only after the Employer terminated its previously-existing pension plan. In fact, the Employer concedes that the organizational documents for the Trust Agreement under consideration here are practically the same as those employed in its Restated Money Purchase Pension Plan. Additionally, it is indisputable that, in its operation, the Plan provided benefits upon the retirement of Ms. Gertrude Goodwine on December 31, 1984. The payments to Ms. Goodwine were necessitated by, and contingent upon, her retirement and were also predicated on her salary and length of service.[12] All of these stipulated facts and circumstances unquestionably demonstrate that, by both its organization and operation, the Plan was not, and is not, a severance pay plan as defined in 29 C.F.R. § 2510.3–2(b). This being true, the sole argument presented by the Trust for qualification as a severance pay plan under Treas.Reg. § 1.501(c)(9)–3(e) is without merit and is appropriately rejected.

2. *The Plan Does Not Provide "Other Benefits" Under Treas.Reg. § 1.501(c)(9)–3(d).*

In addition to its failure to fall within the purview of the "other benefits" examples as described in Treas.Reg. § 1.501(c)(9)–3(e), we hold that the Trust has also failed to satisfy the descriptive elements of "other benefits" within the general meaning of Treas.Reg. § 1.501(c)(9)–3(d), *see supra*. "Other benefits" under that subsection are specifically delineated as those which are similar to

life, sick, or accident benefits that are designed to safeguard or improve health or protect against a contingency that interrupts or impairs earning power. Treas. Reg. § 1.501(c)(9)–3(d)(1) and (2). Retirement benefits, even those paid under the guise, as here, of a severance pay plan, do not satisfy this definition. This is so because retirement is a *planned* occurrence, regardless of whether it is mandatory or voluntary. Also, retirement benefits are not directly designed to safeguard or improve health and, thus, do not have as their critical focus the protection against unknown or unplanned events. This is so in contra distinction to the objectives of a welfare benefit plan. Consistent therewith, we hold that the related severance payments actually disbursed here were not contingent upon unanticipated occurrences. As such, the provision of these retirement benefits are not designed to insulate members against an unanticipated interruption or impairment of earning power as contemplated by Treas.Reg. § 1.501(c)(9)–3(d).

3. *The Plan Is Organized To Provide Non–Qualifying Benefits Similar To Pension Benefits Under Treas. Reg. § 1.501(c)(9)–3(f).*

As previously stated, the Plan does not provide the type of qualifying "other benefits" described in either Treas.Reg. § 1.501(c)(9)–3(d) or (e). Instead, we find that the type of benefits provided at bar mirrors the non-qualifying pension benefits enumerated in Treas.Reg. § 1.501(c)(9)–3(f). Benefits that are similar to pension benefits payable at the time of voluntary or mandatory retirement are explicitly identified as examples of *non-qualifying* benefits. According to Treas.Reg. § 1.501(c)(9)–3(f), "a benefit will be considered similar to that provided under a pension, if it provides for deferred compensation that becomes payable *by reason of* the passage of time, rather than as a result of an unanticipated event" (emphasis added).

---

**12.** The retirement benefits paid to Ms. Goodwine mirror the non-qualifying pension benefits described in Treas.Reg. § 1.501(c)(9)–3(f) rather than to the "other benefits" described in either Treas.Reg. § 1.501(c)(9)–3(d) or (e), *see infra*.

Therefore, in analyzing whether the Plan at issue is similar to a pension plan under Treas.Reg. § 1.501(c)(9)–3(f), we must determine whether, on the undisputed facts on this record, the benefits provided under the Plan are non-qualifying and are a form of deferred compensation, the payment of which is triggered by the passage of time. Under this test, it is clear beyond cavil that the Plan at issue here is in reality a thinly-disguised pension plan. This is so because the benefits payable under the Plan must be viewed as a form of deferred compensation due to the undisputed fact that the amount of the benefits are exclusively dependent upon the salary earned and the length of service with the Employer. Moreover, the compensation is also deferred [13] because the payment of severance benefits will not occur until after the termination of employment. Plan § 1.16. This being true, such provisions for payment, which are tantamount to retirement benefits, cannot qualify as other benefits under 26 U.S.C. § 501(c)(9).[14]

Plaintiff cites for comfort to *Greensboro Pathology Associates v. United States*, 698 F.2d 1196 (Fed.Cir.1982), for the proposition that it is similar to a duly-qualified welfare benefit plan according to the reasoning employed in that case. Thus, the Trust avers that—"there is no basis [for] distinguishing this case from *Greensboro Pathology*." In *Greensboro*, the Court of Appeals for the Federal Circuit held that the educational benefit plan in issue there was "not a plan of deferred compensation but rather a welfare benefit plan under the standards of Treas.Reg. § 1.162–10." *Greensboro*, 698 F.2d at 1203. Therefore, the court held that the employer contributions to the trust were properly deductible under 26 U.S.C. § 162 rather than under 26 U.S.C. § 404 as contributions to a deferred compensation plan.

In so holding, *Greensboro* listed seven factors that help to distinguish welfare or similar benefit plans under 26 U.S.C. § 162 from deferred compensation plans under 26 U.S.C. § 404. In this context, the relevant inquiry in such a determination includes the following questions: [15]

1. Is this a welfare plan: *i.e.*, one concerned with the well-being of the employees?

2. Are the benefits provided [to] employees based upon the employer's earnings?

3. Do the benefits increase for those who have been employed longer by the employer?

4. Are benefits provided to all the employees?

5. Are the plan benefits a substitute for salary?

6. Does the plan serve its stated purpose or is it a sham?

7. Does the employer lose control of the funds it [contributed to] the plan? Is there any sort of reversion of funds to the employer? Is the plan independently

---

13. The directors and shareholders of the Employer, Drs. Leech, Browning, and Like, are the primary beneficiaries of this income deferral. All Employer revenues are generated by the patient billings of these three men. The doctors then determine the compensation of each employee, including themselves.

14. The Plan in issue bears other similarities to a pension plan. The Employer's contributions to the Trust are made pursuant to independent actuarial determinations designed to insure that the Trust contains sufficient funds to meet its obligations under the Plan. As stated in *Latrobe Steel Co. v. Commissioner*, 62 T.C. 456, 464 (1974): "[t]he substance of both a pension and an annuity plan is that they are designed to provide employees with actuarially determinable benefits upon retirement." Thus, to the extent that Plan funding and Plan payments are subject to actuarial determination, as is the case here, this is simply an added indicia that the Plan must be viewed as one providing non-qualifying pension benefits.

15. The court observed that its test is somewhat different from that employed by the Tax Court, in that the Tax Court asks whether the plan in question is "similar to a stock bonus, pension, profit-sharing, or annuity plan." *Greensboro*, 698 F.2d at 1202, n. 5, *quoting Latrobe Steel Co. v. Commissioner*, 62 T.C. 456, 464 (1974). We note that the Tax Court test is very close to the test expressed in Treas.Reg. § 1.501(c)(9)–3(f). We, therefore, view *Greensboro's* expansion on that test as being probative on the issue presented in this case.

administered? [16]

*Greensboro,* 698 F.2d at 1200.

When these factors are applied to the undisputed facts in the case at bar, it is plainly evident—that the Plan, as organized, is at best a hybrid plan designed to provide both deferred compensation and possibly some welfare-type benefits. Moreover, it is clear that for the 1984 taxable year the Plan was organized and *exclusively* operated as a deferred compensation pension plan. This is true because, as *Greensboro* teaches, when plan benefits are tied to length of service, such a plan is one for deferred compensation. In this context, therefore, the CAFC has stated that:

> Where the provision of a plan's benefits are dependent upon an employee's *length of service* or *position,* the plan's characteristics are then analogous to those of [deferred] compensation since amount and type of compensation also depend upon these factors....
>
> \* \* \* \* \* \*
>
> If something is a plan of deferred compensation it should by definition be compensation received in the future for work done in the past. Thus, even if an employee leaves his employer he should receive the benefits of the plan for it is compensation for work that has already been performed.

*Greensboro,* 698 F.2d at 1200–1201 (emphasis added).

We find that the above-quoted passage succinctly describes the nature of the subject Plan as organized and operated during the taxable year in issue. The Plan operated as a plan for deferred compensation throughout the tax year in issue, insofar as it paid *only* retirement benefits with respect to the taxable year 1984. All parties agree, as indeed they must in view of the unambiguous Plan provisions, *see* Plan

§ 4.1, that the amount of benefits provided under the Plan are *directly* tied to *both* previous compensation and length of service. Those benefits *increase* for members who have been employed for a longer period of time, which is another indicia of a deferred compensation plan under *Greensboro,* 698 F.2d at 1200. While the holding in *Greensboro* was favorable to the taxpayer there, our analysis discloses that it benefits plaintiff at bar naught. This is true because the critical facts there are markedly distinguishable from the undisputed facts at bar, in that the indicia of a deferred compensation plan as explicated in *Greensboro* are established by the uncontroverted facts at bar. Consequently, *Greensboro's* impact does not compel a finding favorable to the plaintiff. Finally, the fact that the Plan in issue provides *any substantial* type of deferred compensation is enough, in our opinion, to disqualify the Trust under both Treas.Reg. § 1.501(c)(9)–3(d) and (e). This is particularly true in view of the rule that statutes and regulations granting a tax exemption must be strictly construed. *E.g., Harding Hospital, Inc. v. United States,* 505 F.2d 1068, 1071 (6th Cir.1974) (citations omitted). As has been amply demonstrated, the Plan, as organized, is a plan for deferred compensation, and as such, is a plan for the provision of non-qualifying benefits as described in Treas.Reg. § 1.501(c)(9)–3(f).

4. *In Operation, The Plan Has Paid Retirement Benefits That Are Similar To The Non–Qualifying Pension Benefits Described in Treas. Reg. § 1.501(c)(9)–3(f).*

While we find that the Trust and the Plan are organized to provide benefits that are markedly similar to non-qualifying pension benefits under Treas.Reg. § 1.501(c)(9)–3(f) than the "other benefits"

---

**16.** According to *Greensboro,* 698 F.2d at 1203, n. 6, whether the funds in the plan may ever revert or inure to the benefit of the employer is the "critical inquiry." This inquiry goes to the question of whether the employees have a vested interest in the benefits provided by the plan. In other words, a plan cannot be considered as being concerned with the well-being of the employees under a welfare plan if the employees are not vested under the plan. In our view, then, the "critical inquiry" is not directly relevant to the issue presented under Treas.Reg. § 1.501(c)(9)–3(f), namely, whether the benefits *provided* under the plan are deferred compensation similar to pension benefits that become payable due to the passage of time.

contemplated by Treas.Reg. §§ 1.501(c)(9)–3(d) and (e), we also observe that the Trust has in fact made benefit payments regarding the year in issue which further underscore and support our conclusion. In its 1985 payment to Gertrude Goodwine, as a result of her December 31, 1984 retirement, the Trust, in its operation, provided retirement benefits that were in fact similar to those that are received as part of a pension plan. Ms. Goodwine received her benefit payment *solely* because she retired from her position with the Employer. Payment was made pursuant to a "Payment Authorization Notice," DX 4, signed by Dr. Leech in his capacity as President of the Employer, which listed retirement as the reason for the payment of benefits to Ms. Goodwine. Because Ms. Goodwine was "100% vested" in the Plan, the Notice directed the payment of $20,000 in cash, which was to be paid in two installments in 1985 and 1986. Those funds were paid from the VEBA account. Upon disbursement, the bank, as Trustee, filed a Form W–2P with the IRS entitled "Statement for Recipients for Annuities, Pensions, Retired Pay, or IRA Payments." DX 102.

From the foregoing, it is clear that Ms. Goodwine received payments under the Plan for no reason other than her retirement, an event which is not within the contemplated definition of "other benefits." [17] Retirement is not an unexpected occurrence, such that it could be viewed as being similar to a benefit payable under a plan for life, sick, or accident benefits under Treas.Reg. § 1.501(c)(9)–3(d). It is equally plain that retirement benefits do not qualify as permissible severance benefits under Treas.Reg. § 1.501(c)(9)–3(e) because they do not fall within the definition of a severance pay plan, as previously described, in 29 C.F.R. § 2510.3–2(b). Instead, the payment of retirement benefits to Ms. Goodwine are similar to the type of non-qualifying pension benefits described

in Treas.Reg. § 1.501(c)(9)–3(f) because the receipt of those benefits was a form of deferred compensation for work already performed that became payable due to the passage of time—her length of service with the Employer. Consequently, we hold that the Trust, by paying such severance benefits, in law, paid retirement benefits under the Plan, and thus provided non-qualifying benefits in its operation.

### C. *Inurement*

We now address the third and final issue in our analysis under 26 U.S.C. § 501(c)(9) and Treas.Reg. § 1.501(c)(9)–1(d). More specifically, we must determine whether the Trust, in its efforts to qualify as a tax-exempt VEBA, also satisfies the statutory and regulatory proscriptions against private inurement under Treas.Reg. § 1.501(c)(9)–4, *see infra*. In the context of tax-exempt organizations, private inurement occurs when the net earnings of the organization are a source of impermissible benefit to private individuals. It is the receipt of such a benefit by one who has a personal and private interest in the activities of the organization. *See, e.g., Founding Church of Scientology v. United States*, 188 Ct.Cl. 490, 500, 412 F.2d 1197, 1202 (1969).

The prohibition against private inurement, and interpretive of the statutory language, is outlined generally in Treas.Reg. § 1.501(c)(9)–4(a), which states in part as follows:

> *General Rule. No part of the net earnings of an employees' association may inure to the benefit of any private shareholder or individual other than through the payment of benefits permitted by § 1.501(c)(9)–3....* Whether prohibited inurement has occurred is a question to be determined with regard to all of the facts and circumstances, taking into account the guidelines set forth in this section. The guidelines and exam-

---

17. While the payments to Ms. Goodwine were the only payments made during the tax year in issue, we observe that similar payments were made to Ms. Christine McGuire at some later date. While the parties have made no assertions with respect to the nature of her termi-

nation, the Trust states that Ms. McGuire received benefits similar to those received by Ms. Goodwine. This statement supports the indisputable inference that Ms. McGuire's termination was also due to retirement.

ples contained in this section are not an exhaustive list of the activities that may constitute prohibited inurement....

(emphasis added).

The defendant contends, as its primary thrust, that there is impermissible private inurement in that the three physician/shareholders, who are also the most highly compensated employees of the Employer, will receive 95% of the aggregate benefits that will become payable under the Plan either by reason of termination of employment or discontinuation of the Plan. By having organized the Trust and the Plan in this way, the defendant contends that the doctors have created a vehicle for the anticipatory assignment of income. In turn, the Trust argues that it is in full compliance with all applicable regulations. In specific response to the allegation that a disproportionate amount of the benefits will inure to the three doctors, the Trust avers that the benefits payable under the Plan are permissible under the regulations because they are premised on a uniform percentage of compensation.

We disagree, and find that the disproportionate benefits provided to the three shareholders constitute prohibited inurement. This is true because, construing the statute and regulations strictly, as we must, *Harding Hospital, Inc. v. United States*, 505 F.2d 1068, 1071 (6th Cir.1974), a benefit plan cannot provide unequal welfare payments premised on a percentage of compensation *and* length of service. The issue of disproportionate benefits is raised by Treas.Reg. § 1.501(c)(9)–4(b). In part, that regulation states as follows:

(b) *Disproportionate benefits.* For purposes of subsection (a), the payment to any member of disproportionate benefits, where such payment is not pursuant to objective and nondiscriminatory standards, will not be considered a benefit within the meaning of § 1.501(c)(9)–3 even though the benefit otherwise is one of the type[s] permitted by that section. For example, *the payment to highly compensated personnel of benefits that are disproportionate in relation to benefits received by other members of the association will constitute prohibited inurement....* In general, benefits paid pursuant to standards or subject to conditions that do not provide for disproportionate benefits to officers, shareholders, or highly compensated employees will not be considered disproportionate. See § 1.501(c)(9)–2(a)(2) and (3).

(emphasis added).

Here the undisputed facts clearly show that the Plan, as structured, will pay, and has paid,[18] disproportionate benefits to, and only to, the highly compensated employees of the Employer, Drs. Leech, Browning, and Like. Given the unambiguous language of Treas.Reg. § 1.501(c)(9)–4(b), such payments will, and do, constitute prohibited inurement on the facts here. The plaintiff, however, finds comfort in Treas. Reg. § 1.501(c)(9)–2(a)(2), which purportedly approves the payment of disproportionate benefits of the type provided under the Plan.

Reference to that section demonstrates that the Trust's argument is misplaced. Treas.Reg. § 1.501(c)(9)–2(a)(2) discusses the import of VEBA plan restrictions. Treas.Reg. § 1.501(c)(9)–2(a)(2)(i) states in part:

*Restrictions*—(i) *In general ... eligibility for benefits may not be subject to conditions* or limitations *that have the effect of entitling officers, shareholders, or highly compensated employees* of an employer contributing to or otherwise funding the employees' association *to benefits that are disproportionate in relation to benefits to which other members of the association are entitled.* See § 1.501(c)(9)–4(b)....

(emphasis added).

Obviously, eligibility for benefits under the Plan in issue are "conditioned" on both compensation and length of service.

18. To the extent that Dr. Leech has received benefit payments under the Plan following his termination in 1989, *see* note 4, *supra,* it is clear that, so long as the provisions of the Plan were followed, his benefit was nevertheless disproportionate to that received by Ms. Goodwine, Ms. McGuire, or that which would be received by any other administrative employee.

Those conditions clearly have the effect of entitling Drs. Leech, Browning, and Like to a disproportionate share of the benefits in comparison to the non-professional employee members' entitlement to benefits under the Plan. Drs. Leech, Browning, and Like are the three employees who receive the highest compensation by virtue of their title, position, and tenure with the employer. Drs. Leech, Browning, and Like are also the officers, directors, and shareholders of the Employer. Thus, it is plainly evident that the Plan contains impermissible restrictions that have the *admitted* effect of providing disproportionate benefits to the highly compensated physician shareholders contrary to Treas.Reg. § 1.501(c)(9)–4(b).

The Trust contends, nevertheless, that its payment of disproportionate benefits is permissible under Treas.Reg. § 1.501(c)(9)–2(a)(2)(ii). That regulation provides, in relevant part as follows:

*Generally permissible restrictions or conditions.* In general the following restrictions will not be considered to be inconsistent with § 1.501(c)(9)–2(a)(2)(i) or § 1.501(c)(9)–4(b):

\* \* \* \* \* \*

(F) *The provision of* life *benefits in amounts that are a uniform percentage of the compensation* received by the individual whose life is covered. (G) *The provision of benefits* in the nature of wage replacement in the event of disability *in amounts that are a uniform percentage of the compensation* of the covered individuals. . . .

While the Trust correctly asserts that these examples of permissible restrictions approve disproportionate benefits that are a uniform percentage of *compensation,* neither subparagraph (F) or (G) condone the aggregate restrictions that are part of the subject Plan. This is true because the provision of benefits under the Plan is *not* conditioned *solely* on a uniform compensation. Rather, the benefits at bar are conditioned on compensation *and* length of service with the Employer. Paragrpahs (F) and (G) speak only to permissible restric-

tions based on compensation. They do not approve disproportionate benefits that are conditioned on additional factors such as term of employment. Our interpretation of paragraphs (F) and (G) is inescapable, given the general principle which requires us to strictly construe a statute or regulation purporting to create a tax exemption, and further requiring us to resolve any doubt in favor of the taxing power. *E.g., Harding Hospital, Inc. v. United States,* 505 F.2d 1068, 1071 (6th Cir.1974) (citation omitted).

Here we again note that the Trust can find no support in *Wade L. Moser, et al.,* T.C.M. ¶ 89,142 (P–H 1989). The Trust points to the Tax Court approval of a situation in which the shareholders of a closely-held corporation would receive 90% of the benefits under the VEBA plan. As we have already stated, however, *Moser* did not consider whether the organization in that case qualified as a tax-exempt VEBA under 26 U.S.C. § 501(c)(9). Moreover, *Moser* considered only the question of the propriety of the taxpayer's attempt to deduct its VEBA contributions under 26 U.S.C. § 162. Thus, in approving a plan that would provide 90% of the benefits to the shareholders, the Tax Court stated in *Moser,* T.C.M. ¶ 89–142, at 662–89 (citation omitted), that "there is no statutory or regulatory provision which prohibits a deduction for a contribution to an employee benefit plan merely because a high portion of the benefits are attributable to one employee or group of employees." As we have amply demonstrated by reference to, and analysis of, Treas.Reg. § 1.501(c)(9)–2(a)(2)(ii), the deduction issue in *Moser* is inapposite to the qualification issue presented here. Thus, we hold that *Moser* is inapplicable to our analysis of prohibited inurement.

In sum then, we hold that, by providing disproportionate benefits based on compensation *and* length of service, the Employer has placed impermissible restrictions on the provision of benefits under Treas.Reg. § 1.501(c)(9)–2(a)(2)(ii). Consequently, the provision of disproportionate benefits to the highly compensated employees, share-

holders, officers, and directors is a clear violation of the prohibitions against private inurement contained in Treas.Reg. § 1.501(c)(9)–4(b).

*Conclusion*

We hold, therefore, that the Trust is not a tax-exempt organization under 26 U.S.C. § 501(a) because it is not a VEBA described in 26 U.S.C. § 501(c)(9) and applicable regulations. It cannot, and does not, satisfy, as it must, three of the four *mandatory* requirements for a qualified VEBA enumerated in Treas.Reg. § 1.501(c)(9)–1. Specifically, the Trust is not a "voluntary association of employees," *see* Treas.Reg. § 1.501(c)(9)–1(a), because it is not controlled by an independent trustee within the meaning of Treas.Reg. § 1.501(c)(9)–2(c)(3). It does not provide for the payment of life, sick, accident, or other benefits, *see* Treas.Reg. § 1.501(c)(9)–1(c), because it provides deferred compensation in the form of retirement benefits that are similar to non-qualifying pension benefits described in Treas.Reg. § 1.501(c)(9)–3(f). Finally, the Trust violates the proscriptions against private inurement, *see* Treas.Reg. § 1.501(c)(9)–1(d), because it provides disproportionate benefits to its officers, shareholders, and highly compensated employees in a way that is prohibited under Treas.Reg. § 1.501(c)(9)–4(b). For the foregoing reasons then, the defendant's motion for summary judgment is GRANTED, and that of the Trust is DENIED. The Trust shall pay costs to the defendant. The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.