Graham, Judge,
delivered the opinion of the court.
There is no controversy about the facts of this case. The sale was made by an advertisement by the Ordnance Bureau of the War Department of about 42,000 tons of shell forgings located at eight different places. The advertisement gave the tonnage at each place. The price to be quoted was gross tons f. o. b. cars where stored, shipping instructions to accompany bids; material to be shipped within 10 days after award was made; sight draft to attach to bill of lading; certified check for 10 per cent of the tonnage desired was to accompany the bid.
The plaintiff bid upon three of these lots, as follows:
Lot No. 1, Standard Forgings Co., 1,800 NT 6" $18.68 GT-f. o. b. cars ;
Lot No. 2, Symington Corp., Chicago, 2,118 NT 6" $19.18 GT f. o. b. cars;
Lot No. 3, Winslow Bros., 4,500 NT 6" $19.38 GT f. o. b. cars; and accompanied his bid with the required certified check. The bid was accepted and he was notified of acceptance as of June 14, 1919. The acceptance contained a postscript as follows: “ Tonnages mentioned herein are for net *494 tons more or less.” It also contained the following: “We will follow your instructions and ship to the Central Iron & Metal Company, 36th & Rockwell Sts.” The last-mentioned company was located in the city of Chicago.
The places where lots Nos. 2 and 3 were located were in the city of Chicago and the place where lot No. 1 was located practically adjoining the suburbs of that city.
The certified check of the plaintiff for $16,145.54 was accepted and retained by the Government to be applied against the last shipment.
Of shipment No. 2, 91 tons more than the amount specified in the advertisement were delivered and paid for.
In the case of shipment No. 3 a different situation is presented. As to this shipment the Government failed to deliver 505 tons of the 4,500 tons sold. It appears that 450 tons, at the time of the sale, had been rejected by the Government, and were not owned by it. It had never been the property of the United States, and the quantities given in the advertisement, it appears, were based upon an inventory taken some months prior to the day of the advertisement. As to this shortage of 450 tons the plaintiff can not recover; the act only authorized the sale of material which the Government had purchased, acquired, or manufactured — in other words, owned by the Government. It is not a case of where the President through an executive department was authorized to sell so many tons of steel whether the Government owned it or not. As to the remaining 55 tons of the shortage the acceptance of the hid stated that the tonnage sold was “more or less,” and the plaintiff, having received all that the Government actually had, got what it purchased. There was no authority to sell anything but what the Government owned and possessed at the time. The agent representing the Government could only contract for the sale of such property as the Government owned. The contract here could cover nothing else, and did cover nothing else. The attempted sale of this 450 net tons which were not owned by the Government and 55 tons overestimate was an unauthorized act of the representative of the Government for which the Government under the law can not be held responsible. '
*495 As to lot No. 1 the defendant failed to deliver 819 tons. This shortage was due to the fact that on the 2d of July, several weeks after the acceptance of the plaintiff’s bid, an order was received to ship 843 tons of material to the Erie Proving Grounds, and this was done some time thereafter; it does not appear when.
There is no dispute that the defendant had on hand the amount of this lot No. 1 as advertised at the time of the acceptance of plaintiff’s bid and that its failure to make delivery is due to this subsequent shipment of a portion of it to the Erie Proving Grounds. As to this shortage of 819 tons the defendant is liable to the plaintiff for any loss sustained, and the only question in this case is the amount of this loss and how the amount of this loss is to be ascertained.
It does not appear that any specific time of delivery was fixed by the original contract between the parties, and the actual deliveries of nearly all of the material delivered in the three lots took place between the 20th of August and the 13th of September, 1919, some, however, being delivered as late as the 4th of January, 1920.
The breach of this contract on the part of the defendant was brought about by the action of the defendant in shipping part of this material, as stated, to the Erie Proving-Grounds and thus putting itself in the position where it could not and did fail to deliver. The order for the shipment was dated July 2, and it is to be presumed that shortly thereafter the material was shipped. In any event the order itself in effect withdrew the material and diminished the quantity to the extent of that order.
There is proof in the case, presented by the plaintiff, of the market value of the goods withdrawn and not delivered as of July 17, 1919. It does not appear why this date was selected. In any event it is near enough to the time of the breach by the defendant to be used as proof of value at the time of the breach. While it does not appear when the plaintiff had information as to this shortage, he at least would and could have known of it had he been diligent in the protection of his rights. The contract provided that the material was to be shipped within ten days after the award *496 was made, and the contract was effective as of the 14th day of June. He could have called for the shipment of this material at any time between the 24th of June and the time when the order to ship it to the Erie Proving Grounds was given, and had he done so would doubtless have secured it.
While it appears that upon the discovery of the shortage he made efforts to have the defendant supply him with other materials, it does not appear that it was anything more than the plaintiff’s effort to secure the material. It is not shown that the defendant promised to supply other material. The time, therefore, for fixing the market value of the material is the 17th of July, which market value at Chicago, the place of delivery, at that time was $24.75 per ton. Though plaintiff did go into the market on January 15, 1920, and purchase material to supply this shortage, it does not appear that he made any effort to purchase it prior to- November 9, 1919. The delay in the purchase was his own act, and it does not appear that he could not have obtained it on the 17th of July or soon thereafter.
The measure of damages is the difference between the contract price and the market value at the time of the breach. Shepherd et al v. Hampton, 3 Wheat. 200; Grand Tower Co. v. Philips et al., 23 Wall. 471; Marsh v. McPherson, 105 U. S. 709; Roberts v. Benjamin, 124 U.S. 64; Magna Oil & Refining Co. v. White Stax Refining Co., 280 Fed. 52; Consumers Bread Co. v. Stafford County Flour Mills Co., 239 Fed. 693; Ralli v. Rockmore, 111 Fed. 875; Williston on Contracts, secs. 1382, 1383; Benjamin on Sales, 3d Edition, sec. 1305.
The plaintiff should recover the difference between the contract price and this latter sum, which would amount in the aggregate to $4,438.69. From this should be deducted the sum of $235.00, the amount retained by the plaintiff and due on the purchase price of materials which had been delivered.
Judgment should be entered for the sum of $4,203.69, in favor of Fred E. Hummel, trustee in bankruptcy of The James S. Miller Company, and it is so ordered.
Hay, Judge; DowNey, Judge; Booth, Judge; and Campbell, Chief Justice, concur.