CONDENSER SERVICE & ENGINEER-
ING CO., Inc. v. UNITED STATES
No. 50103.

United States Court of Claims.
Sept. 30, 1953.

Robert S. Caviness, Washington, D. C., for plaintiff. Harold I. Baynton, Washington, D. C., was on the briefs.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiff, Condenser Service and Engineering Company, Incorporated, a New Jersey corporation engaged in the manufacture of steam condensers and heat exchangers, brings this action against the United States for the recovery of damages resulting from an alleged breach of contract by the War Assets Administration in failing to deliver to plaintiff certain items of surplus property.

On March 21, 1947, the War Assets Administration, through its regional office in Richmond, Virginia, issued Special Offering RHO–93–242 inviting sealed bids on 27 designated lots of surplus nonferrous metals. Among the various items included in this Special Offering, Lot No. 331 was especially appealing to plaintiff. This lot consisted of 4,858 lengths or pieces of ¾" copper-nickel tubing weighing 29,444 pounds and 3,750 lengths of ⅞" copper-nickel tubing weighing 39,600 pounds,[1] all bearing Owning Agency Symbol No. 602059–5–1–5712 and was described as being located at the Naval Gun Factory, Washington, D. C. Such tubing was an essential component of the condensers and heat exchangers manufactured by plaintiff since it possessed metallurgical properties making it resistant to rust, corrosion, heat and erosion. Consequently, on March 25, 1947, plaintiff submitted to the Regional Office of the War Assets Administration its sealed bid upon this and other lots contained in the offering.

Plaintiff's bid was submitted upon a standard form furnished by the War Assets Administration which set forth on

---

1. A detailed description of this tubing is set forth in Finding 3.

its back the "Terms and Conditions of Sale," and also the "Standard Conditions of Sale." Under the "Terms and Conditions of Sale" the right was reserved by the War Assets Administration "to withdraw all or any part of the property included in the sale at any time prior to a Contract of Sale." In addition, under the "Standard Conditions of Sale" the War Assets Administration imposed the following pertinent restrictions:

" * * * The Sales Memorandum and these standard conditions of sale constitute the entire agreement between the parties with respect to the sale of the property specified in the Sales Memorandum. * * *

" * * * e. * * * Specific shipping instructions from Purchaser must be received by the Regional Office of War Assets Administration responsible for the sale within ten (10) days from the date of the Sales Memorandum; or if prior to the expiration of said 10-day period Purchaser notifies Seller that he will remove the property, such removal must be effected within fifteen (15) days of the Sales Memorandum. * * *

"f. If the property covered by Sales Memorandum is lost, damaged, or destroyed otherwise than by the fault or negligence of Purchaser prior to removal of shipment during the applicable period prescribed in paragraph (e) above for the removal or the issuance of shipping instructions, Seller's liability shall, at election of Seller, be limited to the replacement of the property lost, damaged or destroyed or refunding any amount paid by Purchaser therefor."

Plaintiff, on May 12, 1947, received notification from the Committee of Awards of the Richmond office that its bid of 23.125 cents per pound for Lot No. 331 had been accepted, and that it would receive the designated quantity of ¾" tubing for $6,808.93 and the designated quantity of ⅞" tubing for $9,157.50, or a total of $15,966.43. In addition, plaintiff was advised that its bid on several of the other lots had also been accepted, but *pending verification that all the items were still available*, it would not receive the formal sales documents.

No additional information was received from the War Assets Administration by plaintiff for several weeks, whereupon, on June 2, 1947 plaintiff advised the Richmond office in writing that the sales documents had not been forwarded. Plaintiff requested early processing of these papers, and inquired whether payment might be made through the establishment of an irrevocable letter of credit. The Richmond office replied on June 9, 1947, stating that this method of payment would be acceptable. Accordingly, on June 20, 1947, plaintiff forwarded to it an irrevocable letter of credit for $26,957.34, the aggregate amount of its bids for the several lots.

Meanwhile, the Richmond office on May 21, 1947 conducted an auction of surplus property located at the Norfolk Navy Yard in Virginia. Among the items disposed of at this auction was a quantity of ¾" copper-nickel tubing, also bearing Owning Agency Symbol No. 602059-5-1-5712, which was sold to Okley L. Post, owner of Post Sales Company, for a sum not revealed by the evidence. Although it was not realized by the War Assets Administration at this time, the tubing sold to Post was actually the identical tubing which had been previously awarded conditionally to plaintiff as part of Lot No. 331, and which had been described as being located at the Naval Gun Factory, Washington, D. C.

Being unaware of these developments, plaintiff on June 11, 1947, submitted a purchase order to Post for approximately the same quantity of ¾" tubing as was embraced in Lot No. 331, and also offered to take a designated additional quantity, all at 15 cents per pound. Post accepted this offer on June 30, 1947, and agreed to furnish plaintiff 4,858 lengths of ¾" tubing located at the Norfolk

Navy Yard at a price of 15 cents per pound.[2]

Immediately following this, on July 1, 1947, the Richmond office of the War Assets Administration forwarded sales documents to plaintiff confirming the formal acceptance of its bids for several of the lots of surplus property, and on July 3, 1947, a sales document was forwarded confirming the formal acceptance of plaintiff's bid on Lot No. 331.

Shortly after the issuance of this sales document to plaintiff, the Supply Officer at the Norfolk Navy Yard, on July 7, 1947, issued an invoice authorizing the delivery of 4,855 lengths of ¾″ tubing to Post in fulfillment of his purchase of May 21, 1947. This invoice provided that delivery was to be made to plaintiff on behalf of Post, and on July 8, 1947, the ¾″ tubing was removed from the Norfolk Navy Yard by a common carrier for shipment to plaintiff. Although both the Supply Officer's invoice and the common carrier's bill of lading listed the owning agency's symbol number set forth above, the evidence does not establish whether or not this fact was noticed by plaintiff.

The letter of credit submitted by plaintiff in payment for the various lots contained shipping instructions for their delivery, but these instructions were not entirely clear. As a result, during the period from July 3, 1947, through July 22, 1947, there was much correspondence between the parties in an effort to clarify the instructions. Once this matter was settled, the War Assets Administration delivered to plaintiff during August 1947 the material which had been awarded to it, with the exception of Lot No. 331, and effected payment by drawing against plaintiff's letter of credit. About the time these deliveries were commenced, plaintiff was notified for the first time by the Richmond office that a mistake had occurred as to the tubing contained in Lot No. 331, that the ¾″ tubing had been sold to Post, and that

the ⅞″ tubing had been sold to someone else whose identity was never definitely established. On August 17, 1947, the Richmond office officially notified plaintiff that Lot No. 331 could not be shipped "due to non-availability," and that an appropriate adjustment of its account had been authorized.

Plaintiff immediately protested this action and demanded that the War Assets Administration either supply the tubing from other sources or compensate plaintiff for its losses. On September 30, 1947, the Washington office of the War Assets Administration replied to plaintiff as follows:

"* * * Our Richmond Office has informed us that during the processing of the sales document, the tubing covered by the sale was inadvertently sold at location and that there was unusual delay in the documentation due to the fact that the material was originally shown as being located in Washington while actually it was located at the Naval Shipyard, Portsmouth, Va. We were further informed that a teletype broadcast was dispatched to all other regional offices in an effort to obtain similar material for you. However, our regional offices replied that tubing of the type required was not in their inventories. * * *"

Plaintiff, on October 10, 1947, replied to this letter and again insisted that either it be furnished similar tubing or else be reimbursed by the War Assets Administration for the difference between the sale price and the price it had to pay to obtain replacement material. Plaintiff also requested advice as to the proper method for it to pursue in an effort to obtain just compensation. Thereafter, plaintiff on several occasions repeated its appeal to the War Assets Administration for relief, but it received no reply until July 26, 1948, when the following decision was received from the

---

2. See Finding 12 and Footnote 5 thereto.

Claims Division of the War Assets Administration:

"In consideration of that part of the claim arising out of the non-delivery of 69,044 pounds of Copper Nickel Tube awarded the claimant company as evidenced by Sales Document No. 4542643, it is concluded that a valid contract existed and WAA breached the contract by its failure to deliver the property awarded. However, the claimant company has submitted no evidence to show that they have been damaged by such breach and accordingly the claim should be denied."

Plaintiff promptly protested this decision, and after pointing out its previous unanswered requests for information relative to obtaining compensation, requested that a hearing be held for the purpose of assessing its damages, or in lieu of a hearing, that it be permitted to submit written proof of its damages. However, on August 31, 1948, the War Assets Administration advised plaintiff that a hearing on the issue of damages would serve no useful purpose since:

"Essentially your claim is one for anticipated profits, which are in the nature of unliquidated damages due to the fact that the material in question was not available for delivery. Funds available to this Administration are not available for payment of such claims.

\*    \*    \*    \*    \*    \*

"In your case, the claim has been reconsidered on the basis of the facts of record, including the matters emphasized in your letter, and since no new evidence was presented in support of the claim, no reason exists for modification or reversal of the decision. Accordingly \*    \* you are advised that the decision of which you were notified by letter of July 26, 1948, represents the final position of the War Assets Administration in this matter."

It is plaintiff's contention that the acceptance of its bid by the War Assets Administration on May 12, 1947, followed by the issuance of the sales document on July 3, 1947, brought into existence a valid and binding contract with respect to this tubing, and that the subsequent action of the War Assets Administration in failing to deliver Lot No. 331 constituted a breach of this contract for which it is entitled to recover damages. These damages plaintiff insists should be measured by the difference between the contract price and the fair market value of equivalent tubing at the time when delivery should have been made.

■■ Defendant maintains that the above related facts and circumstances did not create any liability on its part to respond to plaintiff in damages for the non-delivery of the surplus tubing, and we are of the opinion that this position is correct. In reaching this conclusion we are guided by the principle previously announced by this court in Srere Bros. & Co. v. United States, 60 Ct.Cl. 994, which involved a similar failure to deliver surplus property that had also been sold prior to final acceptance of the plaintiff's bid. In that situation it was held, 60 Ct.Cl. at pages 998–999, as follows:

"This court has several times held that claims growing out of bids for materials which the Government was disposing of as surplus property cannot be enforced against the Government where it appears that the material covered by the bids *is not in the ownership or possession of the government at the time the bid is made or accepted.* The statute authorizes the sale of surplus material, and the authority of the officer is to sell what the Government owns and possesses at the time. Bidders must be held to a knowledge of any limitations upon the authority of Government agents. Hummel case, Hummel v. U. S., 58 Ct.Cl. 489, 494; \*    \*    \*." [Italics supplied].

Cf. Mottram v. United States, 271 U. S. 15, 46 S.Ct. 386, 70 L.Ed. 803, affirming 59 Ct.Cl. 302; Gordon Woodroffe

Corporation v. United States, 104 F. Supp. 984, 122 Ct.Cl. 723; Silberstein & Son v. United States, 69 Ct.Cl. 373; E. A. Schwarzenberg v. United States, 60 Ct.Cl. 898.

■ Although plaintiff was notified on May 12, 1947, that its bid for Lot No. 331 had been accepted, it was given an express warning that the acceptance was conditional "pending verification that the items are still available." Consequently, plaintiff was put on notice that a binding contract did not come into existence at this time. At the same time plaintiff became charged with knowledge that the authority of the Government officials with whom it was dealing was limited to selling material which the Government actually owned at the time of the formal acceptance of its bid. Consequently, the subsequent act of officials of the War Assets Administration in selling the tubing at auction to Post and others on May 21, 1947, removed the tubing from the ownership of the Government and rendered it impossible for plaintiff thereafter to receive a binding contract for the purchase of the same goods. The attempted formal acceptance of plaintiff's bid on June 3, 1947, by the Committee on Awards of the War Assets Administration, although made in good faith, was thus beyond their authority as disposal agents for the United States and did not create a liability on the part of the United States to respond to plaintiff in damages. The War Assets Administration's attempt to obtain the tubing for plaintiff from its other regional offices, although unsuccessful, was, under these conditions, a reasonable and fair effort to relieve plaintiff of any possible injury, and completely fulfilled any obligations which the United States owed to plaintiff.

■ Despite plaintiff's allegations of damages, we fail to perceive how it was injured by this series of transactions. Actually, as a result of the War Assets Administration's act in selling the ¾" tubing to Post plaintiff was enabled to achieve a substantial saving through its subsequent purchase of the identical tubing from Post for much less than the amount of its bid to the Government. Moreover, Post was able to complete delivery of the tubing to plaintiff far more promptly than plaintiff would have been able to have obtained on its own behalf if it had in fact received a valid contract from defendant. As plaintiff's purported damages are thus mainly fictional, we direct that judgment be entered on behalf of defendant dismissing plaintiff's petition.

It is so ordered.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER and MADDEN, Judges (concurring).

We concur. Paragraph "f" of the Standard Conditions of Sale limits the seller's liability to refunding the amount paid if the property sold is "lost, damaged, or destroyed" prior to delivery. This seems to us to cover the situation in this case. Since nothing was paid, nothing can be recovered.