**COMMODITIES RECOVERY
CORP., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 93–146C.

United States Court of Federal Claims.

Oct. 24, 1995.

284

Fredric S. Newman, New York City, for plaintiff.

Michael S. Kane, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were the Assistant Attorney General and Director David M. Cohen, for defendant.

## OPINION

HORN, Judge.

This case comes before the court on cross-motions for summary judgment. The action arises following a government auction of abandoned property conducted under the authority of the United States Customs Service ("Customs"). Plaintiff, Commodities Recovery Corporation ("CRC"), alleges that the United States breached a contract formed at the auction by failing to deliver merchandise

successfully bid upon and paid for by CRC. Plaintiff further contends that due to the government's breach, plaintiff lost the benefit of its bargain, having previously contracted to resell the merchandise to a third-party buyer. Plaintiff, therefore, asserts that the government is liable for damages amounting to the difference between plaintiff's purchase price and the agreed upon resale price established between the plaintiff and a third-party buyer.

Defendant denies liability and has moved for summary judgment. First, defendant asserts that any contract formed between the plaintiff and the defendant at the auction was void *ab initio*. According to the defendant, the officials conducting the auction lacked the requisite authority to sell the particular auction lots at issue, since the lots had been claimed prior to the date of the auction, and the seller did not have possession of the lots on the date of the auction. In the alternative, the defendant argues that if a valid contract was formed, the government is not liable on the ground that under the announced Terms of Sale for the auction at issue, plaintiff had waived all liability on the part of the government, and had expressly disclaimed any warranty or guarantee that title could actually be obtained by the plaintiff buyer.

After careful consideration of the record in the above-captioned case, and as is discussed more fully below, the court, hereby, **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motion for summary judgment.

## FACTS

The facts before the court are undisputed by the parties. Plaintiff CRC is engaged in the business of purchasing and reselling surplus goods, unclaimed cargo, closeout or liquidated goods, as well as general order merchandise and seized property auctioned by Customs. On or about April 1, 1991, CRC learned that Customs would be conducting a public auction for the sale of certain general order merchandise.[1]

1. General order merchandise is defined as merchandise imported into the United States by a consignee upon which duties and/or other charges remain unpaid by that consignee. *See*

Upon inspection of defendant's published Auction Sales Catalog pertaining to the upcoming April 4, 1991 auction,[2] CRC discovered that fourteen lots of general order merchandise, consisting of components compatible with the Nintendo Entertainment System, would be subject to auction. The particular lots of interest to CRC contained two items of Hong Kong manufacture, both sold under the brand name "Camerica". One item was the "Supersonic" wireless joystick for use with Nintendo video games. This joystick was a very popular component at the time and was considered by plaintiff to be a "premium" item. The second item was the "Freedom Connection" controller, a device that converted standard joysticks into remote control units. CRC, believing that there would be an ample market for both of these items, began to seek potential resale buyers for the goods, as it typically did when such an opportunity arose.

Through CRC's pre-auction selling campaign, CRC located the original consignee of the Camerica lots, Acemore International Limited ("Acemore"). From Acemore, CRC learned the model numbers of the items and obtained accurate descriptions of the merchandise, information which CRC considered helpful to secure resale of the merchandise. CRC then negotiated an agreement with Acemore, through which CRC agreed to pay Acemore a ten percent finder's fee for any referral which resulted in the successful resale of the video game components. Acemore provided CRC with the name of its originally intended buyer, Home Shopping Network ("HSN"), of Tampa, Florida. According to plaintiff, after receipt of this information, "on or about April 3–4, 1991," the president and principle stockholder of CRC, Harvey Mandlin, contacted a purchasing representative of HSN to determine whether HSN would be interested in purchasing the Camerica components. The HSN represen-

tative expressed interest in these lots, and Mr. Mandlin quoted the representative a price of $12.50 for each "Supersonic" joystick and $9.00 for each of the "Freedom Connection" remote control conversion units. HSN agreed to buy a quantity of the units at the proposed prices. As a precautionary measure, in the event that the agreement with HSN was not consummated, CRC located a fall-back purchaser, Kent Import–Export Company, which agreed to purchase the merchandise at a discounted price of $10.00 for each "Supersonic" joystick and $6.50 for each "Freedom Connection" conversion unit.

The auction at issue was held on April 4, 1991, with CRC duly registered as a bidder. Mr. Mandlin personally attended the auction on behalf of CRC. CRC was the highest bidder on six of the fourteen lots of video game components offered for sale and the auctioneer knocked down each sale in favor of CRC. These six lots, numbered 0098, 0103, 0104, 0108, 0109 and 0110, were comprised of a total of 10,484 "Freedom Connection" game units and 9,228 "Supersonic" joysticks. CRC tendered payment for the purchased lots with cash and checks, payable to the United States, totaling $34,150.00. In return for these payments, CRC was given a "Notice of Award" for each purchased lot.

On or about April 12, 1991, CRC representatives arrived at the designated government bonded warehouses, the Pittston warehouse located in Port Newark, New Jersey, and the Fidelity warehouse, located in Lyndhurst, New Jersey, to pick up the lots of game components which had been purchased at the auction. Lot 0098 was stored at the Pittston warehouse, while Lots 0103, 0104, 0108, 0109, and 0110 were stored at the Fidelity warehouse. When CRC presented the Notices of Award to the warehouse officials at each respective warehouse, it was informed that only one of the six lots, Lot 0110, was available, and that the other five lots had been

---

19 U.S.C. § 1490 *et seq.* (1988); 19 C.F.R. § 127.1 *et seq.* (1991). This merchandise is held in general order warehouses operated by private parties and licensed by the United States. After the expiration of a statutory "general order period," in which the merchandise is held while Customs awaits payment, the merchandise is deemed unclaimed and abandoned to the government, and is placed for sale at public auction.

*See* 19 U.S.C. § 1491(a) (1988); 19 C.F.R. § 127.21 *et seq.* (1991).

2. Customs has the authority to advertise the sale of the merchandise and to publish catalogs which describe this merchandise under 19 C.F.R. §§ 127.25, 127.26 (1991).

released previously to a third-party on March 21, 1991. Once this discovery was made, defendant reimbursed CRC for the full purchase price of the five lots not delivered to CRC.

CRC later learned that Lots 0103, 0104, 0108, and 0109, stored at the Fidelity warehouse, had been claimed by the consignee, Acemore, on March 21, 1991. Acemore had claimed these lots prior to the April 4, 1991 auction, after paying all outstanding duties and charges and obtaining signed authorization for release by a Customs Inspector.[3] Likewise, Lot 0098, stored at the Pittston warehouse, was released to Acemore on March 21, 1991, also before the April 4, 1991 auction date. Prior to picking up Lot 0098, however, Acemore failed to obtain a General Order Release, failed to obtain the proper documentation, and failed to pay the applicable fees and charges, until April 9, 1991, five days after the date of the auction. Therefore, although the consignee, Acemore, had complied with all the applicable statutes and regulations in obtaining the four lots stored at the Fidelity warehouse, Lot 0098, which had been stored at the Pittston warehouse, was obtained contrary to established Customs procedures.[4] Furthermore, even though five of the lots (0098, 0103, 0104, 0108 and 0109) had been released to Acemore prior to the date of the auction, Customs and its agent conducting the auction appear to have been unaware that the government was no longer in possession of the merchandise at the time of the public auction.

No special announcements, such as reserve status or title qualifications, were made as to the availability of the lots at issue in the instant case prior to, or during, the auction. The Terms of Sale, published in advance of the sale, however, stated in relevant part:

Buyer hereby waives, releases, and renounces any and all obligations and liabilities of EG & G Dynatrend U.S. Customs Support Division and rights, claims, and remedies of buyer against EG & G Dynatrend U.S. Customs Support Division with respect to any defects in such property/merchandise, or products delivered under this agreement, including but not limited to: (1) any implied warranty, merchantability, or fitness for a particular purpose; (2) any implied warranty arising from course of performance of dealing or usage of trade; (3) any obligation, liability, right, claim, or remedy in tort, whether or not arising from the negligence of EG & G Dynatrend U.S. Customs Support Division actual or imputed, and (4) any obligation, risk, liability, right, claim, remedy for loss of use, revenue or profit, liability of buyer to any third party, or for any other direct, indirect, incidental, or consequential damages, or personal injury.

The Terms of Sale further provided:

EG & G Dynatrend U.S. Customs Support Division will furnish to the buyer documents of conveyance sufficient to transfer any right or title *which may be possessed by the U.S. Government* and which may relate to buyer's ownership in the property/merchandise. However, EG & G Dynatrend U.S. Customs Support Division *does not represent, warrant, or guarantee that titles, licenses and/or registrations can in*

---

**3.** Under the applicable statutes and regulations, the consignee may reclaim the merchandise at any time prior to the sale of this merchandise by paying all outstanding duties and charges that have accrued. 19 U.S.C. § 1491(a); 19 C.F.R. § 127.14(b) (1991).

**4.** According to Customs procedures, to reclaim property from a general order warehouse, the consignee must file an entry with the Customs Entry Division and pay all outstanding fees. Once these fees are paid, the Customs Entry Division issues the consignee a Delivery Authorized Document ("DAD"), which indicates that all outstanding duties and taxes have been tendered. The consignee must then present the DAD to the Customs General Order Desk, where Customs officers verify that no liens have been filed and where all other applicable fees which have accrued are collected. Upon presentation of the DAD and payment of any additional fees, the General Order Desk issues the stamps which constitute the General Order Release and allow retrieval of the goods from the warehouse. Similar in effect to the DAD, the General Order Release indicates that all outstanding charges and fees have been paid. This General Order Release must then be presented to the general order warehouse before the merchandise can be reclaimed. The general order warehouse is not authorized to release the merchandise unless such a permit to release or delivery authorization signed by an appropriate Customs officer is presented. *See* 19 C.F.R. § 19.9(c).

*fact be obtained* for any property/merchandise which is the subject of this sale. (Emphasis added).

CRC filed a complaint with this court seeking "not less than a total of $150,000.00," alleging that the defendant is liable to CRC for the profits not realized from resale of the merchandise, as a result of the defendant's non-delivery of the unavailable lots. In plaintiff's motion for summary judgment, plaintiff claimed a somewhat different total and broke the figures down as follows: CRC, seeks $121,015.00, the money that it would have realized from the resale of the merchandise to HSN, and an additional $13,393.00, resulting from CRC's failure to sell Lot 0110 which had been delivered to CRC. It is CRC's position that it could not find a buyer for Lot 0110, because it was an "odd lot" with too few game components to be of interest to potential purchasers. Accordingly, as stated in plaintiff's motion for summary judgment, CRC seeks a total award of $134,408.00, representing its lost profits resulting from the government's failure to deliver the five unavailable lots.

Defendant filed an answer, denying liability on the part of the United States, based upon plaintiff's failure to exhaust administrative remedies and defendant's refund of plaintiff's purchase price. Subsequently, in its motion for summary judgment, defendant asserted that it is not liable to the plaintiff because any contract which may have been formed was void *ab initio*, due to the lack of authority to contract on the part of Customs officials, because five of the lots at issue were not in the possession of the government at the time of the auction. Alternatively, defendant further contends that it is not liable, due to plaintiff's assumption of risk under the express terms of the sale and/or due to what defendant contends was a mutual mistake.[5] On July 1, 1994, both plaintiff and defendant moved for summary judgment.

Based on the record before the court, there appear to be no material facts in dispute. The court, therefore, concludes that the above-captioned case is ripe for summary disposition.

### DISCUSSION

█ Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of this court is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[6] Both rules provide that summary judgment "... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

█ Rule 56(c) of the Rules of the United States Court of Federal Claims (RCFC) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment

---

5. It is defendant's position that because both parties were ignorant of the fact that the merchandise was no longer in the possession of the United States at the time of the auction, that under the Terms of Sale, plaintiff bore the risk of mistake, and that therefore, the government may avoid liability. Plaintiff argues that defendant is precluded from alleging mutual mistake under Rules 8(c) and 9(b) of the Rules of the United States Court of Federal Claims (RCFC) because defendant did not affirmatively plead this defense in its answer. Furthermore, plaintiff contends that any mistake which may have occurred was not mutual. Instead, plaintiff argues that the situation is merely one in which defendant made a unilateral mistake, about which plaintiff was totally ignorant, and that, therefore, the government should not escape liability. Although the

defendant might be precluded from raising a defense of mutual mistake pursuant to RCFC 8(c) and 9(b), such a ruling would be of little significance, since this court, as is discussed more fully below, has found for the defendant on other grounds.

6. In general, the rules of this court are closely patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y DHHS,* 998 F.2d 979, 982 (Fed. Cir.1993); *Imperial Van Lines Int'l Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Rust Communications Group v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Ass'n. Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "... the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the non moving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2511; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Stated otherwise, if, under no scenario, can the nonmoving party present the evidence to support its case, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed. Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assoc.*, 20 Cl.Ct. at 679.

Pursuant to Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to demonstrate that a genuine issue for trial exists. *Id.*

In the above-captioned case, plaintiff and defendant have filed cross-motions for summary judgment. The fact that both the parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the

appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir. 1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976); *Ishida v. United States*, 31 Fed.Cl. 280, 284 (1994). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 322 (1993), *aff'd* 31 F.3d 1176 (Fed. Cir.1994). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.*, 812 F.2d at 1391.

Plaintiff, CRC, argues that the defendant is liable to plaintiff for failing to deliver the merchandise on which plaintiff had successfully bid at the auction on April 4, 1991, thereby depriving plaintiff of the benefit of its bargain, and causing plaintiff to lose resale profits. Plaintiff contends that an enforceable contract was created when the defendant accepted plaintiff's high bid at the public auction and that defendant breached this contract through its subsequent nondelivery of the purchased merchandise. Plaintiff argues that the release of the merchandise to the consignee prior to the auction does not shield the defendant from liability, since the sale following the release of the merchandise constituted error on the part of the defendant, which occurred through no fault of the plaintiff.

In support of its position that the United States is not liable for plaintiff's lost profits, the defendant argues that the contract was void *ab initio*, since Customs lost authority to sell the merchandise once it was claimed by the consignee, Acemore, prior to the date of the auction. In support of this argument, defendant contends that a contract entered into by a government agent acting beyond existing authority is illegal and, therefore, unenforceable. It is defendant's position that, under 19 U.S.C. § 1491(a) (1988), Customs only had authority at the auction to alienate unclaimed and abandoned merchandise, and that the merchandise at issue in this case was neither unclaimed nor abandoned at the time of the auction. In the alternative, defendant argues that if a valid contract was created at the public auction, the express terms of the contract entered into by the parties provided that the government did not warrant or guarantee that title could actually be obtained for the merchandise, and that the buyer waived any liability on the part of the government for the buyer's loss of revenue or profit.

 Public auctions have long been used by the federal government as a vehicle for transferring surplus goods and seized property in the possession of the United States. Auction sales are viewed under the same rules pertaining to the formation of contracts generally. *See*, 1 Samuel Williston, *Williston on Contracts* § 29, (3rd ed. 1957). In auctions, the potential purchaser's bid is the equivalent of an offer to buy the merchandise. This offer is accepted by the auctioneer upon the fall of the hammer. *Id.*; Uniform Commercial Code § 2–328 (1990); *Bottorff v. Ault*, 374 F.2d 832, 835 (7th Cir. 1967); *United States v. Conrad*, 619 F.Supp. 1319, 1321 (M.D.Fla.1985); *Clemens v. United States*, 295 F.Supp. 1339, 1340 (D.Or. 1968). When a government official or his/her agent contracts to sell merchandise without authority to make such a sale, the contract is illegal and, therefore, void *ab initio*. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 2, 92 L.Ed. 10 (1947); *Porter v. United States*, 204 Ct.Cl. 355, 366, 496 F.2d 583, 590 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *Schoenbrod v. United States*, 187 Ct.Cl. 627, 634, 410 F.2d 400, 404 (1969); *see also El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.

1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). Moreover, a contract entered into without authority is void, even if the federal official or agent is unaware of the limitation on his/her authority. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 384, 68 S.Ct. at 2.

■ Furthermore, whereas the government official or authorized agent must have the authority to contract, the purchaser bears the risk of loss if the government official or authorized agent did not have that requisite authority. "One who purports to contract with the United States assumes the risk that the official with whom he deals is clothed with actual authority to enter the contract alleged." *Urban Data Systems, Inc. v. United States,* 699 F.2d 1147, 1154 (Fed.Cir.1983) (citing *Yosemite Park and Curry v. United States,* 217 Ct.Cl. 360, 582 F.2d 552 (1978)) (quoting *Haight v. United States,* 209 Ct.Cl. 698, 538 F.2d 346 (1976), *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976)); *see also Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 384, 68 S.Ct. at 2; *United States v. Amdahl Corp.,* 786 F.2d 387, 392–93 (Fed.Cir.1986).

In the case of sales by Customs, authority to bind the government to the sale of general order merchandise is conferred by Title 19 of the United States Code relating to customs duties, and elaborated on in Part 127 of the Code of Federal Regulations, which specifically pertains to general order, unclaimed, and abandoned merchandise. *See* 19 U.S.C. §§ 1491(a); 19 C.F.R. §§ 127.14(a), 127.21, 127.23 (1993). When the entry into the United States of any merchandise held by Customs is incomplete because of failure to pay duties and other fees which have accrued, the merchandise is considered as unentered and, therefore, deemed general order merchandise. 19 U.S.C. § 1490(b) & (c); 19 C.F.R. § 127.1(b). Any unentered merchandise which remains in a bonded warehouse for more than one year from the date of its importation, without the accrued duties and other applicable charges having been paid, is considered unclaimed and abandoned. 19 U.S.C. § 1491(a); 19 C.F.R. §§ 127.11, 127.12.[7] After the expiration of the one year statutory period, the merchandise is to be appraised and sold by an appropriate customs officer at public auction. 19 U.S.C. § 1491(a); 19 C.F.R. §§ 127.14(a), 127.21–27. This merchandise, however, may be reclaimed at any time prior to such sale, upon payment of any duties or other fees due, whereupon the items are withdrawn from sale.[8] 19 U.S.C. § 1491(a); 19 C.F.R. § 127.14(b).

■ The authority of Customs officials and their agents is limited to the sale of merchandise unclaimed and abandoned at the time of the sale. 19 U.S.C. § 1491(a); 19 C.F.R. § 127.14(a). Of the six lots at issue in the instant case, four lots, numbers 0103, 0104, 0108 and 0109 (stored at the Fidelity warehouse) had been legally reclaimed by the consignee in accordance with the applicable statutes and regulations prior to the auction sale, and were not in the possession of the United States or its agents at the time of the sale. Lot number 0098 (stored at the Pittston warehouse) also had been reclaimed, but not in accordance with applicable Customs' procedures.

■ In addition, when the terms of the sale are made a part of the contractual agreement, bidders are bound by them, whether in ignorance of them or not. A seller may place words of limitation in a warranty of title to sell only such interest as he or she may have in the property. 8 Williston, *supra,* § 978. In *Erie Coal & Coke Corp. v. United States,* 266 U.S. 518, 45 S.Ct. 181, 69 L.Ed. 417 (1925), the Court stated that "[t]he terms and conditions of the sale as set forth in the advertisement were binding alike upon the United States and the bidders." *Id.* at 520, 45 S.Ct. at 181. The *Erie* court found that the government's ac-

---

7. These sections were amended in 1993, to reduce the statutory period from one year to six months. *See* 19 U.S.C. § 1491(a) (1988 & 1993 Supp.); 19 C.F.R. § 127.11 (1991 & 1993 Supp.).

8. Section 127.14(b) provides:

"Merchandise subject to sale ... may be entered or withdrawn for consumption at any time prior to the sale upon payment of the duties, any internal revenue tax, and all charges and expenses that may have accrued thereon."

tions in refusing to deliver the purchased goods were proper because the advertised terms of sale stated that the government "at its election may rescind said sale at any time before August 1, 1922...." *Id.* Similarly, in *Sachs Mercantile Co. v. United States,* 78 Ct.Cl. 801 (1934), the plaintiff was the highest bidder for surplus government clothing purchased from the Department of the Navy. Upon delivery, the plaintiff discovered that many of the articles of clothing were stained and/or damaged. The plaintiff sued the government seeking the return of a portion of the purchase price or, alternatively, delivery of undamaged goods. The *Sachs* court denied plaintiff's requests after referring to the terms of sale contained in the auction catalog, which provided that "[a]ll material listed in this catalogue will be offered for sale by auction 'as is and if is' without recourse." *Id.* at 803. The *Sachs* court noted:

The contract in this case is one of offer and acceptance, the advertisement, bid and acceptance constituting the contract between the parties. It is elementary that one who makes an offer to enter into a contract may do so on any terms that he may see fit to make, as long as they are not illegal, and that if the offer is accepted its terms are binding on both parties.

*Id.* at 812.

In the above-captioned case, the published Terms of Sale for the auction contained an express disclaimer, as follows:

EG & G Dynatrend U.S. Customs Support Division will furnish to the buyer documents of conveyance sufficient to transfer any right or title which may be possessed by the U.S. Government and which may relate to buyer's ownership in the property/merchandise. However, EG & G Dynatrend U.S. Customs Support Division does not represent, warrant, or guarantee that titles, licenses and/or registrations can in fact be obtained for any property/merchandise which is the subject of this sale.

■ The Terms of Sale also contained an express waiver of liability:

Buyer hereby waives, releases, and renounces any and all obligations and liabilities of EG & G Dynatrend U.S. Customs Division and rights, claims, and remedies of buyer against EG & G Dynatrend U.S. Customs Support Division with respect to any defects in such property/merchandise, or products delivered under this agreement, including but not limited to: (1) any implied warranty, merchantability, or fitness for a particular purpose; (2) any implied warranty arising from course of performance of dealing or usage of trade; (3) any obligation, liability, right, claim, or remedy in tort, whether or not arising from the negligence of EG & G Dynatrend U.S. Customs Support Division actual or imputed and (4) any obligation, risk, liability, right, claim, remedy for loss of use, revenue or profit, liability of buyer to any third party, or for any other direct, indirect, incidental, or consequential damages, or personal injury.

In the case at bar, the Terms of Sale, although couched in terms of Customs' agent, EG & G Dynatrend, apply with equal effect to Customs itself, and, thereby, to the United States Government, as the disclosed principal to the transaction. *See* Restatement (Second) of Agency § 292, § 4 cmt. c, § 149 (1958); *see also Ebasco Services, Inc. v. Pennsylvania Power & Light Co.,* 402 F.Supp. 421, 445 n. 37 (E.D.Pa.1975).

■ In seeking to escape the effect of these contract terms, plaintiff argues that the clauses in the Terms of Sale do not apply to the instant case. First, the plaintiff argues that the disclaimer of warranty of title is ineffective because the plaintiff had already received title to the merchandise in the form of the Notices of Award. While the Notices of Award given to the plaintiff documented the auction award of the merchandise to CRC, these notices were not the equivalent of documents of title to the lots at issue. In fact, in the instant case, the consignee, Acemore, had obtained legal title to four of the five unavailable lots, pursuant to 19 U.S.C. § 1491(a) and 19 C.F.R. § 127.14(b), prior to the date of the auction, by paying all outstanding duties and charges. It follows that the receipt of the Notices of Award for these four lots given to CRC were not the equivalent of conveyances of title. Rather, these notices memorialized the sale, serving the same function as a receipt.

■ Second, plaintiff argues that the waiver of liability clause is inapplicable to the instant dispute because the clause applies only to merchandise "delivered under this agreement." Plaintiff asserts that this clause, therefore, is limited in application to merchandise which has actually been delivered and, as such, does not apply to the unavailable lots at issue. Such a restrictive interpretation of the language included in the published Terms of Sale is unreasonable. It would not be logical for the government to limit its liability with respect to delivered merchandise, and have the language of the notice of sale not apply to merchandise which is undeliverable. Moreover, there is no language in the Terms of Sale announcement that the waiver of liability only should be applied to delivered merchandise. In the instant case, plaintiff, CRC, was put on notice by the announced Terms of Sale governing the auction, that the seller "will furnish to the buyer documents of conveyance sufficient to transfer any right or title which may be possessed by the U.S. Government," and that the seller "does not represent, warrant, or guarantee that titles, licenses and/or registrations can in fact be obtained for any property/merchandise which is the subject of this sale."

While at first blush the clauses contained in the Terms of Sale at issue in the instant case may appear to place a harsh risk of loss upon the buyer, disclaimers of this type, uniformly, have been upheld by federal courts. *See Sachs Mercantile Co. v. United States,* 78 Ct.Cl. 801 (1934) (holding that the government can limit its liability with an "as is and if is" disclaimer); *Harry Thuresson, Inc. v. United States,* 197 Ct.Cl. 88, 453 F.2d 1278 (1972) (holding that "as is, where is" clauses are valid disclaimers of warranty, and granting summary judgment to the defendant government); *Dadourian Export Corp. v. United States,* 291 F.2d 178 (2nd Cir.1961) (denying recovery where the government made no guarantee or warranty as to quantity, kind, character, quality, weight, size or description of any of the property).

As one federal appellate court stated when commenting on the nature of government auction sales of surplus goods:

> Buyers of such surplus property know perfectly well that there is always the chance of buying property that may turn out to be of little value, or may develop into a great bargain with a huge windfall of profit. Accordingly, the government very properly has protected itself by formulating its contract for the sale of such surplus property so as to shift the risk from itself to the buyer. As Professor Corbin tells us, a party to a contract may agree to assume certain risks that in the absence of agreement the law would not cast upon him.

*Dadourian Export Corp.,* 291 F.2d at 182. Likewise, in an early Court of Claims discussion of the risks involved in acquiring good title from a government sale, the court wrote: "[t]he principle of *caveat emptor* necessarily comes into consideration because there is no warranty of title...." *Alleman v. United States,* 43 Ct.Cl. 144, 150 (1908). Later in the same opinion, the court summarized that "Governments are not liable for the mistakes of their agents and officers." *Id.*

■ CRC knew of the risks associated with the purchase and resale of government auctioned goods. Indeed, CRC's president, Harvey Mandlin, acknowledged that CRC is engaged in a "very high risk business." A veteran to the resale business, CRC was explicitly put on notice of the possibility of not being able to obtain actual title to the auctioned merchandise put up for sale by the express language of the Terms of the Sale. Moreover, the auction catalog contained several notices encouraging buyers to inspect merchandise before bidding upon it. As it turned out, the auction officials had no authority to sell lots not in their possession to the plaintiff. Consequently, CRC has no basis upon which to demand compensation beyond the return of the purchase price for the non-delivered merchandise, which it has already received.

■ In *Mazany,* 208 Ct.Cl. 996, 529 F.2d 532 (1975), the court dismissed the plaintiff's breach of contract claim in a case factually similar to the one at bar.[9] The *Mazany* case

---

**9.** Plaintiff contends that *Mazany* is not controlling precedent because, in plaintiff's words, the

concerned a thirty-two case lot of stainless steel round bars, which had been stored in a warehouse beyond the statutory period, with the duties and charges left unpaid by the consignee. Upon receiving an advertisement circulated by the Customs Service, plaintiff learned that these steel bars would be sold through a public auction. At the auction, the plaintiff submitted the highest bid for the lots and defendant accepted payment, awarding plaintiff the appropriate Customs form receipt. When plaintiff subsequently attempted to claim the merchandise from the designated bonded warehouse, it was informed that the merchandise had been delivered to another port and surrendered to the consignee, which had paid all duties and charges before the offer for sale.

It appears to be plaintiff's position that, unlike the lots involved in the instant action, the merchandise in *Mazany* had never been unclaimed or abandoned within the meaning of 19 U.S.C. § 1491.[10] *Mazany*, however, did involve a similar situation to the one in the present case: the consignee had claimed its previously abandoned merchandise before the announced Customs sale took place, and the court held that under 19 U.S.C. § 1491, government officials were not authorized to sell merchandise which had been surrendered to the consignee at the time of the sale, since this merchandise was no longer unclaimed or abandoned. *Mazany*, 208 Ct. Cl. at 997. In the *Mazany* opinion, the court noted: "The entire circumstances suggest that defendant offered abandoned merchan-

dise on an 'as is, where is' basis, with no commitment for specific performance, or a money equivalent, with respect to merchandise not found and not existing in the warehouse specified in the catalog of sale." *Id.* The court wrote: "Defendant refunded the bid price which is the most it contracted to do in the circumstances." *Id.*

A similar result was reached in *Condenser Service & Engineering Co. v. United States*, 126 Ct.Cl. 186, 115 F.Supp. 203 (1953). In that case, plaintiff was the highest bidder on several lots of surplus non-ferrous metals offered in response to the War Assets Administration's invitation for sealed bids. After receiving notification that its bid had been accepted,[11] the plaintiff forwarded to the War Assets Administration a letter of credit for the aggregate amount of its bids. Under the Terms and Conditions of Sale, the War Assets Administration had reserved the right to "withdraw all or any part of the property included in the sale at any time prior to a Contract of Sale." *Id.* at 205.[12] Through an error, one of the lots awarded to the plaintiff, Lot 331, had also been sold to a third-party at a subsequent auction. Plaintiff was thereafter informed that Lot 331 could not be delivered due to "non-availability." The Administration then made the appropriate adjustments to plaintiff's account. The court denied plaintiff's demand for compensation for its losses with respect to the non-delivered lot, and wrote:

> This court has several times held that claims growing out of bids for materials

decision "should, in fairness be considered as 'unpublished' within the meaning of Rule 52.1(a) R.C.F.C., providing that 'unpublished' opinions and orders of the Court are binding on the parties but have no precedential effect.'" Although the order is not printed in the Federal Reporter, it is published in United States Court of Claims Reports at 208 Ct.Cl. 996, 529 F.2d 532. The United States Court of Claims Reporter is the official reporter of cases decided by this court's predecessor, the United States Court of Claims. As such, the order is published and, therefore, does not fall within the purview of Rule 52.1(a).

**10.** The statute in effect at the time the *Mazany* court analyzed 19 U.S.C. § 1491 (1970) is substantially the same as the 1988 version of the statute at issue in the case before this court.

**11.** The plaintiff in the case was advised that its bid had been accepted, but for certain lots the

acceptance was made pending verification that the items were still available. Although no such notice was given to CRC, it was placed on notice by the express terms of the sale for the auction that the buyer could only be transferred title to items "which may be possessed by the U.S. Government . . . ," and was given notice that a waiver of liability was also included in the terms of sale.

**12.** Plaintiff attempts to distinguish *Condenser Service* from the present action by arguing that the Terms and Conditions of Sale involved in the *Condenser Service* case contained an exculpatory clause limiting the government's liability. However, as identified earlier in this opinion, a similar waiver of liability provision is contained in the Terms of Sale governing the auction in the instant case.

which the Government was disposing of as surplus property cannot be enforced against the Government where it appears that the material covered by the bids *is not in the ownership or possession of the government at the time the bid is made or accepted.* The statute authorizes the sale of surplus material, and the authority of the officer is to sell what the Government owns and possesses at the time. Bidders must be held to a knowledge of any limitations upon the authority of Government agents. Hummel case, *Hummel v. United States,* 58 Ct.Cl. 489, 494; ... [Italics supplied.].

*Condenser Service & Engineering Co.,* 126 Ct.Cl. at 192–93, 115 F.Supp. at 207 (quoting *Srere v. United States,* 60 Ct.Cl. at 998–99).

An analogous situation also was before the Supreme Court in *Mottram v. United States,* 271 U.S. 15, 46 S.Ct. 386, 70 L.Ed. 803 (1926). In that case, several lots of war surplus steam packing, stored at a United States Engineers Depot, were offered for sale at a public auction. The plaintiff provided the highest bid for the materials, and the lots were accordingly knocked down in his favor. Due to an error in transcribing a list of the materials, however, the quantity of each lot had been advertised in hundredweights instead of pounds, thereby overstating the quantity of steam packing contained in each lot one hundredfold.[13] Upon notification to the plaintiff of the error and that no such quantity had ever been at the depot, the plaintiff, nonetheless, demanded delivery of the quantities of the steam packing upon which it had bid. The Court refused the plaintiff's prayer for relief stating that "[i]t was not the purpose of the United States to sell any property other than that belonging to it and then at its depot...." *Id.* at 18, 46 S.Ct. at 386. In reaching this decision, the Court found that "[p]laintiff was warned by the statement in the catalogue that the sales were to be held subject to errors of description and were to be made without any warranty." *Id.* Moreover, the catalogue an-nounced that "[t]he whole shall be sold ... without any warranty whatever, the buyers being held to have satisfied themselves as to the condition, quality, and description of the lots before bidding." *Id.* at 16, 46 S.Ct. at 386.

As in the *Mazany, Condenser Service,* and *Mottram* decisions, in the case at bar, the seller had expressly disclaimed any warranty or guarantee of title, putting the bidders on notice of the possibility that actual title might not be obtainable for the merchandise, and further inviting prospective buyers to inspect the merchandise before bidding. Based on the above analysis, CRC does not have an enforceable claim for damages for lost profits resulting from the failure to deliver Lots 0103, 0104, 0108, and 0109, which had been released to the consignee according to Customs' procedures and which the government did not have in its possession at the time it placed such merchandise up for bidding at a public auction.

■ Like the four lots stored at the Fidelity warehouse (Lots 0103, 0104, 0108 and 0109), the individual lot stored in the Pittston warehouse (Lot 0098) was delivered to the consignee before the auction on April 9, 1991. Unlike the four lots stored in the Fidelity warehouse, however, the release of Lot 0098, stored in the Pittston warehouse, occurred before the consignee paid the duties and charges due, and before the consignee obtained express authorization to pick up the merchandise. The consignee, however, did satisfy the statutory requirements of 19 U.S.C. § 1491(a), five days after the auction on April 9, 1991, which was three days before the plaintiff arrived at the warehouse to claim the merchandise. Although the statutory requirements for withdrawal of the merchandise had not been satisfied at the time of the auction, the fact remains that, following the March 21, 1991 pickup, the government was not in possession of the merchandise at the time of the auction. In view of the authority discussed above, the result is the

13. The court noted that plaintiff Mottram had inspected the lots and, therefore, should have realized that the advertised quantity was erroneous. Contrary to plaintiff's assertions, CRC could have determined that the lots at issue were missing by trying to inspect them at the warehouses. In fact, the auction catalog, in several places, expressly encouraged prospective buyers, including CRC, to inspect the merchandise before the sale.

same because the government officials and their agents did not have the authority to sell the merchandise which was not in the possession of the United States at the time of the April 4, 1991 auction, regardless of any procedural errors. Therefore, based on the lack of possession, coupled with the specific limitations included in the announced Terms of Sale, which expressly notified prospective buyers of the absence of warranty or guarantee of title, this court concludes that plaintiff also is precluded from receiving lost profits from the government for its non-delivery of Lot 0098.

■ Furthermore, having established that the government is not liable to the plaintiff for lost profits due to plaintiff's inability to gain possession of the unavailable Lots 0098, 0103, 0104, 0108, and 0109, it follows that the government also should not be held liable for plaintiff's failure to find a buyer for Lot 0110. It is possible, as plaintiff alleges, that CRC's difficulty in selling Lot 0110 is related to the non-delivery of the other lots bid upon in the April 4, 1991 auction. Nonetheless, liability for the loss of profits cannot be imposed upon the government when there is no liability associated with the failure to deliver Lots 0098, 0103, 0104, 0108, and 0109. As discussed above, CRC is precluded from recovery for unrealized profits because of the published Terms of Sale which governed the auction and limited the government's liability. The government only promised to supply goods which were in its possession at the time of sale and made no warranty or guarantee that title to the merchandise actually could be obtained. By delivering the one lot which was in the government's possession, and granting the plaintiff a refund for the money tendered for the undelivered lots, the government has satisfied its obligations to CRC under the contract. Accordingly, the court also denies relief for plaintiff's claims associated with Lot 1110.

### CONCLUSION

After a review of the record in the above-captioned case, this court finds that the government is not liable to CRC for profits it allegedly lost due to the government's failure to deliver merchandise purchased by CRC at the public auction held on April 4, 1991. The Customs officials and their agents lacked authority to bind the government to the sale of Lots 0098, 0103, 0104, 0108 and 0109, which was no longer in its ownership or possession. Therefore, in light of the express announcement in the Terms of Sale that the seller did not warrant or guarantee that title to the merchandise could be obtained and that a buyer who participates in the auction waives all liability of the government for any and all loss of revenue or profit, the government should not be held liable for the damages claimed by the above-captioned plaintiff. Furthermore, based on the discussion above, the government also is not liable for lost profits allegedly owed on Lot 0110.

Therefore, the court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's motion for summary judgment. The Clerk's Office is directed to enter judgment in favor of the defendant in accordance with this decision.

**IT IS SO ORDERED.**